In the Matter of the **ESTATE** of August LaGARCE, Deceased.

**Bertha LaGARCE, Executrix of the Estate of August LaGarce, Deceased, Respondent,**

v.

**Leona MOULDON and William B. Quinn, Appellants.**

No. 57936.

Supreme Court of Missouri, En Banc.

Dec. 11, 1972.

Martin Schiff, Jr., Fordyce, Mayne, Hart-
man, Renard & Stribling, Clayton, Richard
R. Russell, Kirkwood, for respondent.

James E. Heckel, St. Louis, for appel-
lants.

HOLMAN, Presiding Judge.

This is a discovery of assets proceeding.
See §§ 473.340 to 473.353,[1] inclusive. The
probate court sustained a motion for judg-
ment on the pleadings filed by plaintiff-ex-
ecutrix and accordingly entered a judg-
ment for plaintiff. Upon appeal to the cir-
cuit court a judgment was also entered on
the pleadings in favor of plaintiff and
against defendants. Defendants appealed
to the St. Louis District of the Court of
Appeals. That court adopted the opinion
of Judge Simeone which reversed the
judgment and remanded the case with
directions to enter a judgment in favor of
defendants. Upon plaintiff's application
we ordered the case transferred to this
court. It will be determined here "the

[1]. Statutory references are to RSMo 1969, V.A.M.S.

same as on original appeal." Mo.Const., Art. V, § 10, V.A.M.S.

We adopt a portion of Judge Simeone's opinion, as follows:

"On February 3, 1970, Bertha LaGarce, executrix of the estate of August LaGarce, filed an affidavit to discover assets which she alleged were unlawfully withheld by James and Leona Mouldon and William B. Quinn. She alleged that savings certificate No. 494 of the Tower Grove Savings and Loan Association of St. Louis, Missouri, in the sum of $7,000, was unlawfully withheld by the Mouldons and Quinn.[2] The probate court ordered a citation to issue to the Mouldons and Quinn to appear.

"Subsequently, and in accordance with law, interrogatories were addressed to James and Leona Mouldon and William B. Quinn. Answers were, in due course, filed by the defendants. No evidence was ever taken since a motion for judgment on the pleadings was sustained. The interrogatories, exhibits, and the answers given constitute the pleadings and contain the controlling and dispositive facts.[3]

"Sometime prior to August 21, 1969, August LaGarce was the sole owner of a Tower Grove Savings and Loan Association Certificate No. 494 in the amount of $7,000. On that date, according to the answers to interrogatories, August LaGarce, in the presence of James and Leona, had the certificate transferred to his name and the names of James and Leona 'as joint tenants with right of survivorship and not as tenants in common.' This was done at the Tower Grove office. Contemporaneously, each signed an agreement which stated that '* * * It is agreed by the signatory parties with each other and by the parties with the Association that any funds placed in or added to the account by any one of the parties is and shall be conclusively intended to be a gift at that time of such funds to the other signatory party or parties to the extent of his or their pro rata interest in the account * * *.' The agreement was in the names of August LaGarce, James Mouldon, and Leona Mouldon 'as joint tenants with right of survivorship and not as tenants in common, and not as tenants by entirety * * *.' * * * No consideration was paid by James or Leona. The certificate was delivered by August to James and Leona on that same date. August was the first cousin to James' mother. On August 21, 1969, when August instructed the Tower Grove Savings and Loan Association, in the presence of James and Leona, to change the certificate from his name alone to his name and James and Leona, there was a conversation between these parties and Mrs. Mayer, an employee of Tower Grove. August told Mrs. Mayer that he wanted to change the certificate so that 'if anything happened to him the certificate would belong to James Mouldon and Leona Mouldon.' After Mrs. Mayer changed the certificate by typing the names of James and Leona and each had signed the card, Mrs. Mayer handed the certificate to August who in turn handed it to James Mouldon. Mrs. Mayer then said, 'The way that certificate is now made out, the person holding it can bring it in and cash it at any time without the signature or consent of the others, and if anyone whose name is on it dies then it will belong to those that are living.' August said, 'Yes, that is the way

2. While the cause was in the circuit court James Mouldon died and his death was suggested to the court. The substitution of the executor of the estate of James Mouldon was waived.

3. The respondent moved to strike the depositions of Bertha LaGarce, Russell Loving, and Theresa Mayer, filed as Exhibit No. 2 in this court, as not being before the court. The depositions were never introduced in either the probate court or the circuit court below. The depositions are not necessary for a determination of this case—the facts contained in the interrogatories, exhibits, and answer thereto are sufficient for a determination of the cause. The respondent also moved to strike the circuit court file, but this file, almost the duplicate of the probate court file, is properly to be considered and the motion to strike this exhibit is overruled.

I want it, and I want them to have it and keep it and if I want it I can get it. I know they won't cash it.' James replied, 'If he wants it back he can get it.'

"On August 23, 1969, the Mouldons retained defendant-appellant William B. Quinn to advise them as to the legal effect of the transfer and delivery of the certificate. About a week later, on August 30, 1969, Quinn was retained by August La-Garce to represent him in a controversy he was having with his wife. In due time, August reconciled with his wife and wrote to Quinn that his services were no longer necessary and paid him for services rendered between August 30 and September 30, 1969. During the term of Quinn's employment, August delivered to him certain property and securities, consisting of cashier's checks, a passbook savings account, a certificate of deposit, bank stock certificates and savings certificates issued by Tower Grove, but these securities did not include Certificate No. 494. Later, and on September 26, LaGarce went to Quinn's office and requested the return of these assets and securities. Quinn responded by letter on September 29, advising August he would return the assets just as soon as his schedule permitted him to arrange an appointment. On the same date LaGarce wrote Quinn terminating Quinn's services and requesting a statement. On September 30, August wrote to Quinn informing him that he had reconciled with his wife but was unable to fulfill the reconciliation agreement because Quinn had the assets in his office. On October 3, Quinn returned the assets to August and was paid for his services from August 30 to September 30, 1969.

"On the evening of October 3, August telephoned Leona and told her that his wife, Bertha, had promised to return to their home and live with him, provided he agreed to put her name on all his property. Leona asked him if he was calling to have the certificate returned and he said 'that wasn't the way he wanted things, but that he was very sick' and needed someone to take care of him. In this conversation Leona told August that she would turn the certificate (No. 494) over to his friend John Zakibe that evening. After concluding the phone conversation, Leona and her husband 'decided' to make the certificate available to August by placing it in the hands of Mr. Quinn. That same evening Leona telephoned August and told him 'what had been decided by my husband and me about making the certificate available to him.'

"On October 7, the certificate was delivered to Quinn by the Mouldons, who on that date retained Quinn 'for the purpose of making it available to August and only to him' at the office of Quinn upon the condition that August would pay $150 to Leona and one Ruth Moffit for house cleaning and laundry.

"In her answers to interrogatories, Leona stated that on October 7, 1969, the certificate was placed in the possession of William B. Quinn with the request that 'he hold it so as to make it available to August LaGarce at the office of William B. Quinn, to be picked up personally by August LaGarce, when and if he so desired,' upon the conditions set forth above.

"The next day, October 8, a female telephoned Leona at her home and identified herself as Mrs. Mayer of Tower Grove. Mrs. Mayer stated she was calling about the certificate that August had transferred. She stated that August and his wife had been in the office for the purpose of having the certificate changed to the name of August and his wife but that since August did not have the certificate the change could not be made. She asked Leona if she had the certificate and if 'we would give it to Mr. and Mrs. LaGarce.' Leona told her that the certificate had been turned over to Quinn 'to make it available to August LaGarce, and only August La-Garce, and that if he wanted it he, and only he, could pick it up from William B. Quinn at his office.' Mrs. Mayer replied that August was very sick and that it was

likely he would die and that he could not go to Quinn's office. Leona then stated that if August was so sick that he might die, then she would not turn over the certificate to anyone under any circumstances since it was August's intention that 'my husband and I have the certificate if he died, and that I would instruct William B. Quinn not to give the certificate to anyone, including August LaGarce, until the outcome of his illness was known.' Leona was unable to reach Quinn until after August died, when she instructed him to return the certificate to her, which was done on October 15.

"Strangely, all the circumstances came to a head on October 9, 1969: (1) Quinn received a telegram from an attorney, Richard Russell, demanding immediate delivery of the certificate; (2) Quinn dictated and signed a letter addressed to August requesting him to arrange to be in Quinn's office on October 10 for the purpose of making available to August, and no other person, the certificate in dispute and to collect $150 for services rendered to him; and (3) August died.

"Subsequently, the attorney for the executrix, Bertha LaGarce, demanded from Quinn that the savings certificate be returned, and within a few days thereafter the Mouldons retained Quinn to represent them in their claim to sole ownership of the certificate. The Mouldons claim ownership of the certificate because they say that August made a gift of it to them at the time he had it transferred from his name alone to him and the Mouldons.

"On February 3, 1970, the executrix of August's estate filed with the probate court her affidavit to discover assets alleging that James and Leona and Quinn had unlawfully withheld the certificate. * * *

"In the proceedings in the probate court, James and Leona moved to join Tower Grove as an additional party; Quinn moved for summary judgment; and Bertha, the executrix of August, moved for judgment on the pleadings.

"On December 23, 1970, the probate court denied the motions of James and Leona and Quinn, sustained Bertha's motion for judgment on the pleadings, and entered its order directing the defendants to deliver the certificate, finding that it was an asset of August's estate.

"The probate court, in a memorandum opinion, held that '[t]aking the pleadings as a whole there can be no question but that both the decedent and the respondents Mouldon intended that the creation of the so-called "joint tenancy" was for the sole purpose of making a testamentary disposition of the certificate for $7,000. It was not and could not have been a valid gift inter vivos, as respondent contends, under the admitted facts. The decedent did not create a true joint tenancy because he did not surrender control to the respondents.' The probate court relied on Jenkins v. Meyer, Mo.Sup., 380 S.W.2d 315. The court, therefore, rendered judgment on the pleadings in favor of Bertha. Defendants appealed to the circuit court.

"In the circuit court the executrix suggested the death of James Mouldon which occurred on February 16, 1971, and the executrix, Leona, and Quinn waived substitution. Bertha refiled her motion for judgment on the pleadings; defendants filed a joint motion for summary judgment. The circuit court denied the defendants' motions and sustained the motion for judgment on the pleadings, received the entire transcript on appeal, concurred with the findings and conclusions of the probate court, and affirmed the judgment.

\* \* \* \* \* \*

"The respondent, Bertha, in her brief, urges that the joint savings account card is not properly a part of the record and is not before this court for consideration. She contends that the signature card appears in the transcript of the probate court as an exhibit to a motion by Leona to join the Tower Grove Savings and Loan Association as a party defendant which was denied by the probate court. This motion was withdrawn in the circuit court.

It also appears in typed form as an exhibit attached to an affidavit appended to the defendants' motion for a new trial in the circuit court.

"We believe that both the certificate and signature card (agreement) are to be considered in determining the issues in this case. The affidavit to discover assets filed by Bertha states that the defendants are unlawfully withholding the savings certificate which is in the control of the defendants. The certificate is based on the signature agreement. The answers to interrogatories refer to the signature card having been signed by all the parties and the legal memoranda filed in the probate court make reference to the agreement. The executrix did not object that the agreement should not be considered in either the probate or circuit court. Furthermore, the circuit court necessarily considered the agreement in reaching its conclusion. Hence, we believe that neither the certificate nor the agreement can be ignored in reaching our conclusions."

As heretofore indicated the trial court adopted the findings and conclusions of the probate court which found for plaintiff on the theory that the pleadings indicated that the certificate did not create a valid joint tenancy because August did not surrender control and intended only to make a testamentary disposition of it; that August therefore could not have made a valid gift inter vivos. Upon this appeal the defendants contend that the trial court erred in entering judgment on the pleadings for plaintiff because the said pleadings did not establish that the savings certificate was an asset of the estate. For reasons hereinafter stated we agree with that contention.

In our consideration of this appeal we have thoroughly researched the law of this and other states in regard to joint accounts. After so doing we are inclined to agree with the conclusion, " 'That there are in the cases confusion and contradiction and perplexing distinction is obvious.' " "THE POOR MAN'S WILL," 53 Columbia Law Review 112. Another writer has characterized the present state of the law by stating that "Judicial statements with respect to the status of the joint bank gift range from continued attempts to identify the joint account by traditional concepts to recognition of the account as a new and useful technique for transferring property which need not fit any historical molds." "JOINT BANK ACCOUNT MUDDLE," 26 University of Chicago Law Review 401. Most of the states have enacted statutes which make provision for joint accounts. A summary of the various types of statute appears in 10 Am.Jur.2d, Banks, § 372, pp. 335, 336, as follows:

"Some states have statutes providing that a deposit in the names of two or more persons, payable to either or the survivor or survivors, shall be a joint tenancy and prima facie evidence of an intent to vest title to the deposit in the survivor or survivors. Such a statute creates a presumption of survivorship when a deposit is made in the form prescribed thereby, and reasonably clear and persuasive proof is required to overcome the persumption. * * * Other states have statutes prescribing that a deposit in the name of the depositor and another in form to be paid to either or the survivor, is deemed their joint property withdrawable by either or the survivor. Some courts takes the view that such a statute creates a rebuttable presumption that a bank deposit made in the form prescribed thereby is the property of the depositors as joint tenants with right of survivorship. Other courts have held, however, that such a statute creates a joint tenancy with the right of survivorship in a deposit made in the form prescribed thereby, and does not simply create a presumption to that effect. There seems to be no doubt, however, that where an account is in the form prescribed by such a statute, that fact, unexplained by other competent evidence, fixes the respective rights of the depositors named as joint owners, with all the incidents attaching to such

ownership, including the right of survivorship. * * * Some statutes specifically provide that the making of a bank deposit in the form of a joint tenancy with right of survivorship shall be conclusive evidence of the intention of the depositors to vest title in the survivor. An agreement made in the form contemplated by such statute cannot be challenged by other evidence of intent, in the absence of fraud or undue influence."

The great difficulty the courts have had in determining the validity and effect of statutory joint accounts results from the fact that the relationships created "do not fit readily into common-law categories. The four unities of the common-law joint tenancy, the notion of an undivided moiety in each joint tenant, and the difficulty of applying the common-law concept of joint tenancy to a fluctuating *res* have caused difficulties. Common-law doctrines governing gifts of personal property have contributed their share to the complex of legal problems stemming from joint bank accounts, for the common law required a complete relinquishment of ownership by the donor in order to achieve an effective gift, while the joint bank account contemplates power of withdrawal by both parties. The varying methods adopted by the courts in meeting these problems appear in the cases collected and discussed in the following annotations: 48 A.L.R. 189; 66 A.L.R. 881; 103 A.L.R. 1123; 135 A.L.R. 993; 149 A.L.R. 879." In re Schneider's Estate, 6 Ill.2d 180, 127 N.E.2d 445, 447, 448.

Missouri has two statutes relating to joint accounts, both originally enacted in 1915. Section 362.470 relates to banks and trust companies, and § 369.150 governs deposits in savings and loan associations. And in all material respects they are the same. We quote § 369.150 in its entirety, as follows:

"1. An association may issue membership certificates in the name of two or more persons, whether minor or adult, and in form to be paid to any one or more of them, or the survivor or survivors of them.

"2. Such account, and any additions made thereto by any of them, shall become the property of such persons as joint tenants and shall be held for the exclusive use of the persons so named and may be paid to any person named therein, or the survivor or survivors of them.

"3. And such payment and the receipt or acquittance of the one to whom such payment is made shall be a valid and sufficient release and discharge to said association, whether any one or more of the persons named be living or dead, for all payments so made by the association on such account prior to the acknowledgment of receipt by, or service by an officer empowered to make service of process upon, said association at its home office of notice in writing signed by any one of such joint tenants not to pay such account in accordance with the terms thereof.

"4. If there are more than two persons named in such membership certificate and one of such persons dies, the account represented by such certificate shall become the property of the survivors as joint tenants. Such a joint account shall create a single membership in an association."

The following indicates the construction the courts of this state have placed upon these statutes: "Deposits made and accounts created within the purview of these statutes presumptively become the property of the persons named as joint tenants and, absent competent evidence to the contrary, actually fix the ownership of the funds in the persons named as joint tenants with the attendant right of survivorship. * * * The presumption is rebuttable and may be overcome by competent parol or other evidence showing a different intent.[1] [see also extensive collection of cases in footnote.]." Melton v. Ensley, Mo.App., 421 S.W.2d 44, 51. Also, the re-

cent cases of Jenkins v. Meyer, Mo.Sup., 380 S.W.2d 315, and Wantuck v. United Savings and Loan Ass'n, Mo.Sup., 461 S.W.2d 692, disclose that this court has regarded the transfer of assets by joint account as a gift, and it is required that all of the common-law elements be present in order for the account to constitute a valid gift inter vivos. The situation which most often results in a joint account being held to be invalid as a joint tenancy is that in which the depositor furnishing the money expresses an intention to retain control during his lifetime and for the fund, at his death, to go to the surviving depositor. In that situation it is said that the requirements of a valid gift are absent, and also that such is void because testamentary in nature and thus in violation of the statute of wills.

It is interesting to consider how the foregoing statutory construction developed. The first case discussing that question was Ball v. Mercantile Trust Co., 220 Mo.App. 1165, 297 S.W. 415. In Ball the court adopted the construction placed upon an identical statute by a New York court and stated: " * * * it is our view, and we so hold, that under the provisions of our statute, quoted supra, the deposit in the bank in the form in which it was made was sufficient, in the first instance, to establish in this action a joint ownership in the fund with all the incidents attached to such ownership, including the attendant rights of survivorship therein. Also, that the depositors or their representatives, as between themselves, may be permitted to introduce other competent evidence that the actual agreement, if any, as between the parties was that title to joint ownership was not intended to be established, nor in fact conferred." 297 S.W. l. c. 418. A short time later this court stated that "under the construction given to such statute by respectable judicial authorities, a presumption arises thereunder that the deposit became the property of the depositors as joint tenants or owners, with the attendant right of survivorship, at least in the ab-

sence of competent evidence to the contrary." Mississippi Valley Trust Co. v. Smith, 320 Mo. 989, 9 S.W.2d 58, 1. c. 63. The later cases, as stated in Meyer, supra, developed the gift theory and held that accounts where the intention was to retain the beneficial interest during the donor's lifetime were not valid joint tenancies.

We have concluded that the heretofore indicated construction placed upon our joint account statutes is erroneous and has been misleading to depositors who have complied with said statutes. Our courts have placed limitations thereon and have added requirements thereto which are not contained in the statutes and are not warranted. Section 369.150 specifically and unqualifiedly provides that if the certificate is issued in the statutory form the account "shall become the property of such persons as joint tenants and shall be held for the exclusive use of the persons so named and may be paid to any person named therein, or the survivor." There is nothing in the statute which would warrant the conclusion that a rebuttable *presumption* is created that the deposit shall become the property of such persons as joint tenants and that it may be shown by competent evidence that it was not a joint tenancy even though the statutory form had been complied with. The statute says it *"shall become the property of such persons as joint tenants."* The limitations were placed upon the statute by judicial interpretation apparently resulting from a consideration of common-law principles.

■■■ It is our view that the statute creates what might be described as a statutory joint tenancy which should be given effect without consideration of the strict common-law requirements mentioned in the cases. In the case before us we are particularly interested in the rights of the surviving depositor. Upon the death of the depositor who furnished the money, we cannot see any reason why the surviving joint tenant should not be held to be the owner of the deposit even though the do-

nor may have intended to retain the beneficial interest in the account during his lifetime. It is true that such an arrangement is somewhat of a testamentary nature, but we see no reason why the statute of wills should prevail over equally valid statutes relating to deposits in banks and savings and loan institutions. As indicated in 21 Journal of the Missouri Bar 394, "ANOTHER VIEW OF JOINT BANK ACCOUNTS," by Charles B. Blackmar, the courts have approved a number of arrangements with testamentary purposes which transfer money and property without the use of a will. The statute is clear and needs no construction. It is our view that if the statute is complied with, in the absence of fraud, undue influence, mental incapacity, or mistake, the survivor will become the owner of the account. Depositors have a right to expect the statute to be enforced according to its plain language. We are supported in our view by the decisions in Lett v. Twentieth Street Bank, 138 W.Va. 759, 77 S.E.2d 813; Tesch v. Miller, 227 Ark. 74, 296 S.W.2d 392 [1]; McConnell v. McCook Nat. Bank of McCook, 142 Neb. 451, 6 N.W.2d 599, and Crabtree v. Garcia, Fla., 43 So.2d 466. It follows from the foregoing that the Jenkins and Wantuck cases, supra, and others with similar holdings, to the extent that they conflict with the views heretofore set out, should no longer be followed.

■ Plaintiff has suggested in her brief that any transfer of the certificate was revoked by August prior to his death. We do not agree. At most, the evidence shows an intent by the Mouldons, for a short period of time, to return the certificate, and an intent to terminate or sever the joint tenancy and not an actual severance thereof. Even if the certificate had been delivered to August and he had possession thereof, there could not be an actual termination of the joint tenancy unless and until August had actually cashed in the certificate. An intent to terminate the joint tenancy agreement cannot be equated with actual termination.

We rule, as indicated, that the trial court erred in sustaining the plaintiff's motion for judgment on the pleadings which ruling was based on the finding that August did not surrender control of the certificate and intended a testamentary disposition of it.

Both sides have briefed contentions relating to the applicability of the parol evidence rule to this case in accordance with the holding in Commerce Trust Co. v. Watts, 360 Mo. 971, 231 S.W.2d 817. Our ruling herein makes it unnecessary to consider those contentions.

■ While we have reached the same result (although on a different theory) as the court of appeals that the judgment should be reversed, we do not agree with the directions of that court to the trial court to enter judgment for defendants. There has been no trial of this case, and no evidence has been taken, since the judgment was on the pleadings. The plaintiff has not yet had an opportunity to offer evidence, if she has any, on the issue as to whether there was any fraud, undue influence, etc., relating to this transaction, which evidence we have stated would be appropriate. The judgment should therefore be reversed and the cause remanded for further proceedings in accordance with the views herein expressed. It is so ordered.

All concur.