**Victor B. PETERS, Personal Representative of the Estate of James Frank Fata, Deceased, Plaintiff-Respondent,**

v.

**Edith R. CARR, Defendant-Appellant.**

**No. WD 33330.**

Missouri Court of Appeals,
Western District.

June 21, 1983.

Michael J. Svetlic, Kansas City, for defendant-appellant.

Victor B. Peters, Platte City, for plaintiff-respondent.

Before PRITCHARD, P.J., and MANFORD and NUGENT, JJ.

NUGENT, Judge.

Edith Carr appeals from the order of the probate division of the circuit court in this action for the discovery of assets in the estate of her step-father, James Frank Fata. She argues that the trial court erred in ruling that she wrongfully withheld $8,379.60 from the estate. We affirm.

The record of this case is replete with testimony relating to confusing transfers of funds between various savings accounts. A lengthy repetition of that confusion will serve little purpose here. The decisive facts are as follows.

On April 5, 1968, a savings account numbered 52861 was opened at Sentinel Federal Savings and Loan Association of Kansas City, Missouri, in the names of Rose Fata or James Fata or Vincent Fata as joint tenants with right of survivorship. The signature card authorized transfer of "any part or all" of the account on request of any of the joint tenants. (Rose Fata is the mother of defendant Edith Carr; James Fata is the step-father of Edith Carr and the husband of Rose Fata; and Vincent Fata is the son of James Fata.)

On May 7, 1974, Sentinel Federal account number 90552 was opened in the names of Rose F. Fata, James F. Fata and Edith Carr as joint tenants with right of survivorship.

On November 16, 1976, Rose Fata transferred $6,620.32 from account 52861 to an account she held jointly with Edith Carr, and $15,177.44 from account 90552 to still another account she maintained with Edith Carr. Both accounts were held by Edith Carr and Rose Fata as joint tenants with right of survivorship.

From December, 1976 to April, 1978, Edith Carr removed a total of $16,759.20 from the accounts she held jointly with her mother through a series of large withdrawals ranging from over $1,000 to over $9,000.

On May 15, 1980, James Frank Fata was declared incompetent. Victor Peters was appointed guardian of the estate.

On June 1, 1980, Mr. Peters filed this action to discover the assets of James Fata, stating that he "had good cause to believe and does believe that Edith Carr has concealed or embezzled or is otherwise unlawfully withholding certain personal property of the said James Frank Fata." No written answer was forthcoming from Edith Carr, a failure attributed by her counsel to the fact that she did not receive proper service. In a pretrial discussion, defendant's counsel waived the improper service and stated that had an answer been filed, it would have been a general denial. The court accepted this oral answer.

At trial, Mr. Peters presented the above facts and read into evidence a deposition of James Fata. Asked whether he knew if anyone had taken any of his property, Mr. Fata responded, "I never know. They took some of the stuff over a long time. I don't know where it got to. It's all gone." Mr. Fata did not define "they" or "stuff." Asked specifically whether Edith Carr had taken any of his property, he answered unintelligibly and then added ambiguously, "The furniture is that property. Never took any of that, no. I don't know." Mr. Fata stated that he had given his wife all his money so that she could take care of him.

At this point, plaintiff rested. Following the court's denial of defendant's motion to dismiss, Ms. Carr presented testimony by Rose Fata that she knew of no embezzlement or concealment of property by her daughter and that anything done by Edith Carr in regard to the bank accounts was done at her request. The relationship between Rose Fata and Edith Carr was apparently close. Not only was Ms. Carr trusted to handle financial matters for Rose Fata, she provided a home for her mother at the time of trial and took care of her by driving her to the doctor, the bank and to shopping areas.

Mrs. Fata testified that she and James Fata had jointly owned and operated a fill-

ing station before their retirement and that when the business was sold, the money was used to buy a house. The excess went into a joint bank account. She did not know how much money she had in the bank at time of trial.

Ms. Carr testified repeatedly that in regard to the financial affairs of her mother, she never acted other than at her specific request. "I haven't done anything except what my mother has told me to do." This included the transfer of funds from one account to another and the withdrawals of funds. Over plaintiff's continuing objection that Ms. Carr had not pleaded an affirmative defense of payment, she denied ever keeping any of the money withdrawn for her own use and stated that all cash withdrawn was given to her mother. She agreed that her mother was not making a gift to her when she put her name on the accounts and that she had no ownership interest in the money. She did not contribute any of her own money to the accounts. She knew of no accounts held by her mother on which her name did not also appear.

Ms. Carr denied any knowledge of the present amount of either her mother's or her step-father's assets. She did state that the joint account held by Rose Fata and James Fata to which she was added in 1974 (90552) had a balance at that time of $15,-177. She stated she did not recall the balance of the account held by Rose Fata, James Fata and Vincent Fata (52861), but that she did not dispute either the $6,600 figure plaintiff's counsel said was in the account or the $21,000 figure which he said her parents held in both accounts in 1976.

She further agreed that at the time of the guardianship, her mother and step-father had less than $500 which she was holding for them and which she turned over to the guardian.

As to the discrepancy between the $21,-000 in 1976 and $500 in 1980, Ms. Carr testified that her mother had "been living on it. She's spent it. Ask her."

In rebuttal, Mr. Bradley Grill, guardian of the estate of Mrs. Rose Fata, testified that in an earlier deposition, Mrs. Fata stated that Edith Carr had some money belonging to her in a bank "somewhere up north" and that she had never received sums of money from any person over $500. (The $500 was received from Edith Carr to buy a tombstone.)

On September 23, 1981, Judge Baber entered an order finding that Edith Carr had withdrawn a total of $16,759.20 from joint accounts held with her mother and that the estate of James Fata was entitled to one-half that amount. Accordingly, judgment in the amount of $8,379.60 was entered against Edith Carr.

On appeal, Ms. Carr argues (1) that the trial court erred in finding that funds were wrongfully withheld because no evidence was presented to show funds were transferred without James Fata's knowledge or consent and (2) that the judgment was against the weight of the evidence because no evidence was presented that she embezzled, concealed or unlawfully withheld assets of the estate of James Fata.

In reviewing the matter, we must affirm the judgment of the trial court unless no substantial evidence supports it, unless it is against the weight of the evidence, or unless the court either erroneously declared or applied the law. *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo.1976) (en banc).

In deciding the sufficiency of the evidence, we must view all the evidence and the inferences that can be drawn therefrom in a light most favorable to the respondent (plaintiff herein), disregarding the appellant's evidence unless it aids the respondent. *Kramer v. Leineweber,* 642 S.W.2d 364, 366 (Mo.App.1982).

Doing so, we find that the reasonable inferences that can be drawn from the evidence are as follows. In 1976, Rose Fata withdrew a total of $21,797.76 from two bank accounts held jointly with her husband and others, an amount resulting from the combined work of Rose and James Fata. The $21,797.76 represented the total balance then in the accounts and was transferred to accounts held jointly with the defendant, Edith Carr.

■ Because he stated that he did not know where his property had gone, we infer that James Fata neither knew of nor consented to this transfer. On these facts, we do not find that his statement that he entrusted all his money to Rose Fata so that she might take care of him constituted an implied consent to her total withdrawal of their joint savings. Had the evidence shown that the purpose of the total withdrawal was to facilitate his care in some way, the situation might be entirely different.[1] But here, no evidence whatsoever was offered to suggest that any part of the money withdrawn was devoted to his care or that the transfer was accomplished to facilitate access to the funds for his benefit. We cannot construe his statement to suggest that he consented to a transfer which totally removed his name from the funds and which did not benefit him in any way. Ms. Carr's first point, that the evidence did not show a lack of consent, must be ruled against her.

■ In considering Ms. Carr's second point, that the evidence failed to establish that she embezzled, concealed or unlawfully withheld assets of the estate of James Fata, we first consider the nature of a discovery of assets proceeding[2] as discussed in *In re Estate of Mitchell,* 610 S.W.2d 681, 684 (Mo. App.1980).

A discovery of assets action, as its name implies, is a search for assets owned by the [incompetent], and, thus, traditionally in these actions, the ultimate issue is whether title to the assets in question had passed from the [incompetent] to another person prior to the former's [incompetency]. . . . Implicit in the traditional procedure is a denial that there was an effective transfer of title from the [incompetent] to another party. The issue of title is framed by the petitioner simply alleging that the [incompetent] held title at his [incompetency] to certain described property and that this property is being adversely withheld by another person. . . . The [incompetent's] legal representative may initiate the action, and, once the initiating petitioner makes a prima facie showing that the [incompetent]

---

1. *See Hathman v. Waters,* 586 S.W.2d 376, 382 (Mo.App.1979), quoting *Harrellson v. Barks,* 326 S.W.2d 351, 361 (Mo.App.1959), for those circumstances in which a presumption of consent might be warranted, as follows:

   " 'Where the withdrawals are partial and not obviously to obtain unfair ownership or advantage, and where the purpose of the withdrawal can reasonably be considered as one which could suit the wishes, purposes, and intention or consent of both the owners of the entirety account, and there is no apparent objection after the withdrawal is known, then the *presumption* should be that the withdrawal was by consent and agreement of the joint owners.' (emphasis in the original)." None of these circumstances is present in the case before us.

2. The procedure for a discovery of assets is provided in § 473.340, Revised Statutes of Missouri, 1978 as follows:

   1. *Any executor, administrator, creditor, beneficiary or other person who claims an interest in personal property which is claimed to be an asset of an estate or which is claimed should be an asset of an estate may file a verified petition in the probate division of the circuit court in which said estate is pending seeking determination of the title, or right of possession thereto, or*

*both.* The petition shall describe the property, if known, shall allege the nature of the interest of the petitioner and that title or possession of the property, or both, are being adversely withheld or claimed. The court may order the joinder, as a party, of any person who may claim an interest in or who may have possession of any such property.

. . . .

3. *Upon a trial of the issues, the court shall determine the persons who have an interest in said property together with the nature and extent of any such interest.* The court shall direct the delivery or transfer of the title or possession, or both, of said property to the person or persons entitled thereto and may attach the person of any party refusing to make delivery as directed. If the party found to have adversely withheld the title or possession, or both, of said property has transferred or otherwise disposed of the same, the court shall render a money judgment for the value thereof with interest thereon from the date the property, or any interest therein, was adversely withheld. In addition to a judgment for title and possession, or either, or for the value thereof, the court may enter a judgment for all losses, expenses and damages, if any, but not including attorneys fees, if it finds that the property was wrongfully detained, transferred or otherwise disposed of. (Emphasis added.)

owned the property in question at his [incompetency], the burden of going forward and the burden of proof shifts to the respondent to show there was an effective transfer of the property from [incompetent] to him.

The case of *Allmon v. Allmon,* 306 S.W.2d 651, 655 (Mo.App.1957), states as well that where the defendant admits possession of certain property which belonged to the decedent (or incompetent), he has the burden of proving repayment, if that is his defense.

Accordingly, despite the "embezzled, concealed or unlawfully withheld" language in the petition, petitioner Vincent Peters' burden was simply to establish that Edith Carr had come into possession of funds once held in savings accounts to which James Fata had held joint title and that Mr. Fata had a right to the return of his interest in the funds. Once established, the burden shifted to Ms. Carr to show either that title was effectively transferred to her (as by gift), or that she had repaid the money.

The documentary evidence (withdrawal slips and checks made out to Edith Carr) clearly showed that the defendant did come into possession of $16,759.20 once held in savings accounts to which James Fata held joint title. To determine whether Mr. Fata had a right to the return of his interest in the funds, we first consider the effect of the landmark case of *In re Estate of La-Garce,* 487 S.W.2d 493 (Mo.1972) (en banc), explicitly reaffirmed in *Pollock v. Brown,* 569 S.W.2d 724, 731 (Mo.1978) (en banc).

Prior to *LaGarce,* Missouri case law had held that the presumption that deposits to accounts held as joint tenants with right of survivorship are the property of those tenants was rebuttable. The *LaGarce* court quoted at 500 the then-applicable statute which provided that such deposits "shall become the property of such persons as joint tenants," and stated that "[t]here is nothing in the statute which would warrant the conclusion that a rebuttable presumption is created ...." Accordingly, the court held at 501 that "if the statute is complied with, in the absence of fraud, undue influence, mental incapacity, or mistake, the survivor will become the owner of the account." If the *LaGarce* principles applied to this case, then, Ms. Carr would be entitled to ownership of any funds in the account and evidence to the contrary would be inappropriate.

The recognition in *LaGarce* that absent certain factors, the applicable statute, now § 364.174,[3] creates an irrebuttable presumption of ownership in the surviving owner,[4] has been limited, however, to apply only following the *death* of one of the owners. As the court stated in *Carroll v. Hahn,* 498 S.W.2d 602, 607 (Mo.App.1973), "*LaGarce,* however, did not deal with the rights of the parties to such joint accounts *during their lives*" (emphasis added) and instead, addressed only the rights of the survivors upon the death of the other joint tenants. In contrast to *LaGarce* which held that following death, the intent of the parties was irrelevant, the *Carroll* court stated at

**3.** All sectional references are to Revised Statutes of Missouri, 1978, unless otherwise indicated.

**4.** The present statute, § 369.174, was amended after the opinion in *LaGarce,* which was interpreting the then-applicable statute, § 369.150, Revised Statutes of Missouri, 1969. The amendment reinforces the conclusive effect which creation of the account has in establishing the intent of the parties to vest title in the survivor. Section 369.174 provides in pertinent part:

1. When a savings account is opened or maintained in an association in the names of two or more persons, whether minor or adults, as joint tenants or in form to be paid to any of them or the survivors of them and whether or not the names are stated in the conjunctive or the disjunctive or otherwise, the savings account and all additions thereto shall be the property of such persons as joint tenants. The moneys in the account and all earnings on the account may be paid to any of such persons during his lifetime or to any one of the survivors of them after the death of any one or more of them. The opening or maintenance of the account in such form, in the absence of fraud or undue influence, shall be conclusive evidence in any action or proceeding to which either the association or any survivor is a party of the intention of all the parties to the account to vest title to the account and the additions and earnings thereto in the survivor.

607 that during their lifetimes, "the real intention of the parties and the purpose and nature of the account may be shown to determine the interest each has in the account, thus subjecting the one who has deposited none of the funds to accountability and liability." Accordingly, the court held that *the sole depositor* of the joint funds in that case had the power to revoke the account, appropriate any or all of the funds, and divest the interests of the joint tenant.[5]

For a comparable interpretation of *La-Garce, see Blue Valley Fed. Sav. and Loan Ass'n v. Burrus,* 637 S.W.2d 737 (Mo.App. 1982), in which this court held that as between two surviving joint tenants following the death of the third, evidence as to the intent of the parties when the account was established was irrelevant according to *La-Garce* and could not be used to divest one of the survivors of ownership. Nevertheless, as to what the respective interests of the two survivors should be, the court held at 743 that evidence of disproportionate contributions would be relevant and could be shown to overcome the presumption of equal interests between joint tenants.

■ Harmonizing this recognition of the contributor's right to hold the non-contributor liable for withdrawal, with the statutory provision that all money held in joint accounts may be paid to *any* of the joint tenants, see § 369.174 in footnote four, we interpret the statute merely to authorize payment by the financial institution to either joint tenant, relieving that institution of liability for doing so. The statute does not make such payment conclusive as to ownership between the parties during their lifetimes,[6] however, in contrast to the conclusive effect given to joint ownership when one joint tenant dies.

As between Rose Fata and Edith Carr, then, § 369.174 and *LaGarce* would have given Ms. Carr unqualified ownership of their joint funds, whatever the intent of the parties, had Mrs. Fata predeceased her. During their respective lifetimes, however, Ms. Carr's freedom to withdraw substantially all the assets of the account was not unfettered and, as indicated in *Carroll v. Hahn, supra,* and *Blue Valley Federal, supra,* remained subject to evidence as to the source of the funds and the intent of the parties. Here, Ms. Carr freely admitted that the funds came from joint accounts held by Rose and James Fata and that she had no ownership interest whatsoever.

The question remains whether Ms. Carr can be held accountable for those funds by her step-father's estate. That, of course, depends on whether the estate can trace the funds from the accounts in which Mr. Fata was a joint owner to accounts held by Mrs. Fata and Ms. Carr.

The leading case in point is *Feltz v. Pavlik,* 257 S.W.2d 214 (Mo.App.1953). There, William and Viola Pavlik, husband and wife, held $4,100 in a joint savings account, primarily representing the proceeds of the sale of the family farm. Both had contributed to the down payment on that farm and both had worked throughout their married lives, contributing to savings. The husband became critically ill and while hospitalized, wrote a check on the account for $3,900 to his brother who deposited the check in an account held in his name and William's. Ultimately, the brother transferred the money to an account held with his wife. William then died.

The *Feltz* court noted at 218 the rule that "[w]hile either tenant of a joint tenant bank account may, without the other's con-

---

**5.** This is consistent with *McGee v. St. Francois County Sav. and Loan Ass'n,* 559 S.W.2d 184, 188 (Mo.1977) (en banc), which cited *In re Estate of Hampton,* 547 S.W.2d 886 (Mo.App. 1977); *Carroll v. Hahn, supra;* and *Jackson Sav. and Loan Ass'n v. Seabaugh,* 395 S.W.2d 260 (Mo.App.1965) for the rule (applied in *McGee*) that a joint tenant who had contributed the money and held the certificate could terminate the account by causing the alteration

of the existing certificate or by causing it to be cancelled and obtaining the issuance of a new one.

**6.** *See Johnson v. Herrin,* 272 S.C. 224, 250 S.E.2d 334, 336 (1978), for the statement that "the contractual agreement between the banks and depositors does not conclusively determine rights between the parties."

sent, withdraw all or part of the fund . . . a joint owner may not assign the entire account . . . so as to divest the other joint tenant of his right to the funds." When such an attempt to divest the other is made, "the joint tenancy is not destroyed, the proceeds retain their character as joint property wherever they may be traced, and a constructive trust may be impressed thereupon." Accordingly, a constructive trust was imposed on the funds in the hands of the brother and his wife.

The post-*LaGarce* effect of *Feltz v. Pavlik, supra,* has not been consistently determined by our courts. In *Carroll v. Hahn, supra,* the court stated at 607 that "either party to the 'joint account' may withdraw any or all of the funds so that they cannot be traced to third parties . . . ." That statement would seem to contradict *Feltz,* and yet *Feltz* was cited in *Carroll* at 608 and distinguished as a case involving a joint account to which both parties had contributed, making it "a proper subject for tracing the joint funds and the imposition of a constructive trust thereon."

*Feltz* was addressed as well in *White v. Roberts,* 637 S.W.2d 332 (Mo.App.1982). There, without further citation of authority, the court stated that "*LaGarce, supra,* casts doubt on the doctrines of tracing set forth in *Feltz v. Pavlik, supra,* particularly where the funds are transferred to a joint account with third parties . . . ." Because the transfer of funds to third parties was not at issue in *White v. Roberts, supra,* we are not bound by that dicta. Moreover, although we would agree that *LaGarce* would dictate that where funds have been transferred to a new joint account with a third party and one of the parties to that new account dies, the irrebutable presumption arises that absent fraud or undue influence the survivor is the owner of the funds, *LaGarce* said nothing that would preclude a tracing of funds held by joint tenants, both of whom are living. *See also Blue Valley Fed. Sav. and Loan Ass'n. v. Burrus, supra,* at 745, which cited *Feltz* for the rule that "one joint tenant cannot deprive the other of his interest in jointly owned property by his appropriation of it, and that the [co-con-tributor's] interest as a co-owner followed the fund."

We see no reason not to apply the rule in *Feltz* to this case where funds held jointly and contributed to equally by both husband and wife were transferred by the wife to a joint account held with a third party, Edith Carr. While both the wife and Edith Carr live, the husband (or his representative) is entitled to trace the funds and impose a constructive trust on them.

Having so decided, we hold that when plaintiff established that funds held and contributed to jointly by James and Rose Fata were withdrawn without his knowledge and deposited to other accounts with a third party, he had met his burden of establishing that James Fata had been deprived of his interest in over $21,000 once in savings accounts to which he had held joint title, and that he had a right to the return of those funds. Moreover, the funds were traceable to those other accounts during the lifetimes of Rose Fata and Edith Carr, the joint tenants.

Plaintiff having met his burden, the burden shifted to Edith Carr to establish either that title was effectively transferred to her or that she had repaid the money. (*See Allmon v. Allmon, supra,* a discovery of assets proceeding in which the court held that a defendant who admitted that he had possessed $4,000 belonging to the deceased had the burden of proving repayment.) No effort was made to establish transfer of title, and in fact she admitted that she had received the money and yet had no ownership interest in the funds. The only evidence of repayment was Ms. Carr's own testimony that she either merely transferred funds between accounts for her mother, or gave her the cash. She offered no documentary evidence of deposits made to other accounts held by her mother although, as an admitted co-depositor, she should have known their location. Further, although Mrs. Fata stated that her daughter had never stolen anything from her, she did not substantiate her receipt of large amounts of cash from her daughter. We cannot say,

then, that the trial court erred in apparently finding that Ms. Carr failed to prove repayment and therefore, held assets belonging to the estate of James Fata.

For the foregoing reasons, we find substantial evidence to support the judgment of the trial court and accordingly, we affirm that judgment.

Doing so, we are not unaware of the problem of determining the amount to which the estate is entitled. Neither party has raised this point, but we note that because the evidence indicated that James and Rose Fata worked and contributed equally to accounts 52861 and 90552 (totalling $21,-797.76) and that the additional joint tenants to those accounts (Vincent Fata and Edith Carr) contributed nothing, James Fata was entitled to one-half the transferred funds, or $10,898.88. Edith Carr withdrew $16,-759.20. A dilemma arises as to whether James Fata should be entitled to recover from Edith Carr *all* of the funds he could rightfully claim from the accounts, $10,-898.88; whether he should be entitled only to the amount Edith Carr withdrew in excess of her mother's share, that is, $5,860.32; or whether he should be entitled to one-half the withdrawn amount, the $8,379.60 awarded by the trial court.

A choice between the first two alternatives turns on an unanswerable question— whether the first $10,898.88 withdrawn by Edith Carr was taken from her step-father's share (entitling him to a return of that full amount) or whether it was taken from her mother's share (entitling him only to the $5,860.32 taken from his share). Because the question cannot be resolved with commingled funds of this nature, the equitable solution is the one supplied by the trial court, deeming one-half the withdrawals as taken from James Fata's share, and one-half from Rose Fata's. This solution leaves James Fata's estate over $2,000 shy of full recovery, but because it may be entitled to recover that amount from Rose Fata, the apparent recipient of the funds not withdrawn by Edith Carr, it is not left

without remedy. We therefore affirm the amount awarded.

All concur.