Ken CREVISTON, Plaintiff–Appellant,

v.

ASPEN PRODUCTS, INC., and
William P. Biggins, Defen-
dants–Respondents.

No. 26561.

Missouri Court of Appeals,
Southern District,
Division Two.

June 28, 2005.

Motion for Rehearing and Transfer Denied
July 19, 2005.

Application for Transfer Denied
Aug. 30, 2005.

Steven E. Marsh, Hulston, Jones & Marsh, Springfield, for Appellant.

Mark S. Gunnison, Payne & Jones, Chartered, Kansas City, Ronald A. Conway, Reynolds & Conway, P.C., Springfield, for Respondents.

KENNETH W. SHRUM, Judge.

Ken Creviston ("Ken") filed a seven-count suit seeking compensatory and punitive damages from Aspen Products, Inc. ("Aspen") and William P. Biggins ("Biggins"). Ken's claims arose from a 1993 handwritten document ("Document") signed by Biggins and Bill Limbaugh ("Limbaugh"). Until Limbaugh died in 1994, Biggins and Limbaugh were business associates, equal owners of the corporate stock of Aspen, and officers and directors of Aspen.[1]

Biggins filed a counterclaim against Ken seeking to recover money loaned to Ken. The counterclaim involved a promissory

---

1. In this opinion we refer to Ken Creviston as "Ken" without intending disrespect. When referring collectively to Aspen and Biggins, we call them "Defendants."

note wholly unrelated to the Document or its provisions.

The trial court entered summary judgment adverse to Ken on his claims against Defendants. It also entered summary judgment for Biggins on his counterclaim against Ken on the promissory note. Ken appeals. This court affirms.

## FACTS

Aspen is a Missouri corporation that, from at least April 1978 through 1994, located its principal corporate offices and production plant in Lenexa, Kansas. On February 10, 1993, Limbaugh asked Biggins to sign the Document and Biggins acceded to that request. This happened at Aspen's corporate offices in Kansas.[2] Because the Document is the genesis for Ken's claims, we reproduce it in its entirety:

"2–10–93

"To: Bill Biggins

From: Bill Limbaugh

"1. In the event of my death—please take *$80,000.00* from my loan to Aspen Products—*immediately* use it to pay for Gary Jackson's college costs—tuition, room, board, books, etc. Distribute it approximately *$20,000* yearly when Gary's time for college comes.

"Note—Gary's ph. # is 966–9915—he is staying at Dorothy Jackson's home at 10636 Waldroud—K.C.Mo 64137.

loa___

"2. Also—please immediately take from Aspen $300,000.00 + transfer to an account in Aspen to Ken Creviston—

4133 S. Hooper—Sgfd.Mo. 65804. Please distribute at $25,000.00 per year plus Aspen floating % over prime on going interest rate for 12 years.

"Please handle these things immediately and privately as long as I have this much money *$380,000.00* loaned to Aspen. If my loan to Aspen is depleted, then this request is cancelled.

Notary *Susan M. Bradt*

Signed *Bill B. Limbaugh*

Expires: January 7, 1997

DATE: *February 10, 1993*

Agreed to by *William P. Biggins*"

The reference to Limbaugh's "loan to Aspen" in the Document is rooted in Limbaugh's and Biggins' long-standing practice of lending money to their corporate entity, Aspen. Thus, when Limbaugh died on October 8, 1994, Aspen owed him at least $865,000.

A will and "living trust" made by Limbaugh in 1988 was in place when he died. Although the will was probated in Kansas, the Document was never presented to nor filed with the Kansas probate court during the pendency of the estate, either as an attempted testamentary document or as a claim against Limbaugh's estate. Moreover, the Document was never mentioned in settlement agreements reached regarding Limbaugh's estate.[3]

Ken sued Defendants on January 5, 2000, seeking $300,000 actual damages and unspecified punitive damages based on the Document. Defendants' answer raised

---

**2.** Susan Bradt (a secretary for Aspen) notarized Limbaugh's and Biggins' signatures on the Document.

**3.** One of the settlements was reached after Aspen filed a claim in the Limbaugh probate estate for $715,500. The agreement offset Aspen's $715,000 claim against the $865,000 note balance owed by Aspen to Limbaugh,

and Aspen paid the executrix the balance of what it owed, i.e., $149,500. The other settlement agreement resolved questions and potential disputes among recipients of Limbaugh's estate and trust beneficiaries. Ken (who was named in Limbaugh's will) was a party to the latter agreement.

multiple affirmative defenses.[4] One such defense was that the Document was "an invalid and unenforceable attempt at a testamentary disposition and/or distribution of assets." When Biggins answered Ken's suit, he also filed a counterclaim against Ken. The counterclaim was for $15,000 (plus interest) on a loan Biggins made to Ken. After extended discovery, Defendants filed a motion for summary judgment on Ken's claims. Also, Biggins moved for summary judgment on his counterclaim against Ken. The trial court sustained both motions and entered summary judgment against Ken. This appeal by Ken followed.

## STANDARD OF REVIEW

Appellate court review of the grant of summary judgment is essentially de novo. *ITT Commercial Fin. v. Mid–America Marine Supply Corp.*, 854 S.W.2d 371, 376[4] (Mo.banc 1993). Summary judgment is correct when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Id.* at 376[7]. The record is reviewed in the light most favorable to

the party against whom judgment was entered and the non-moving party is granted the benefit of all reasonable inferences from the record. *Id.* at 376[1,3]. A summary judgment may be affirmed under any theory that is supported by the summary judgment record. *Kesterson v. Wallut*, 157 S.W.3d 675, 679[3] (Mo.App.2004).

### Point I: Was Document Invalid Attempt At Testamentary Disposition?

■ Although Point I of Ken's brief has multiple parts, the issues that are dispositive of Ken's claims can be found in Point I(A). There, Ken argues the trial court "could not properly have ... construed [the Document] as a handwritten 'will' or an invalid testamentary disposition and, therefore, [Ken's] claims thereunder were not barred on that basis."

In developing his argument, Ken implicitly concedes we should affirm if the Document can only be interpreted as Defendants claim, namely, as an attempted testamentary disposition.[5] He insists, however, that any such claim is fallacious. Instead, Ken argues that the Document,

---

4. Defendants also pled affirmatively that (1) the Document was unenforceable because of Ken's failure to submit it to the Kansas probate court as a testamentary document; (2) Ken's only recourse was to use the Document as the basis for filing a creditor's claim against Limbaugh's estate; (3) the Document was cancelled by "its own terms" because the set-off taken by Aspen reduced the "net" debt owed Limbaugh to less than $380,000 at the time of his death; (4) Ken's claims were barred by the set-off agreement among Aspen, the Limbaugh estate, and the Limbaugh trust; (5) Ken's claims were barred by the settlement agreement between the legatees and distributees in the probate estate; (6) Ken could not recover because the Document was not supported by consideration; and (7) Ken's suit was time barred.

5. For example, Ken's brief recites:
 "Ken has never asserted that he was entitled to recover under the Document because it was a will, intended to be a will, or

intended to take effect only upon Limbaugh's death. Rather, the petition simply alleged that Ken had a right to enforce the provisions written in paragraph 2 that called for the immediate transfer of $300,000.00 to an Aspen account for Ken and distributed to him at the rate of $25,000.00 per year, with interest.

. . . .

 "As alleged in Ken's Second Amended Petition, the Document simply assigned or allocated $300,000.00 to Ken for immediate transfer to an account in Aspen. Contrary to Defendants' suggestions, Ken makes no claim that the Document was a testamentary disposition intended to take effect *only* 'in the event of [Limbaugh's] death.' Only the Defendants make *that* claim. Defendants' 'testamentary disposition' argument is a *'red herring'* effort to *reconstruct* paragraph 2 of the Document and to *redefine* Ken's claims thereunder."

by clear and unambiguous language, evinced an intent on the part of Limbaugh to assign or allocate $300,000 to Ken for *immediate transfer* to an account in Aspen. Alternatively, Ken argues that if the Document is ambiguous, thus requiring parol evidence and explanation to show Limbaugh's intent, then its interpretation becomes a question of disputed material fact and not a matter of law upon which summary judgment could be granted.[6]

■ Ambiguity in a document is said to arise if there is duplicity, indistinctness, or uncertainty in the meaning of the words used therein, or if the instrument promises something at one place and takes it away at another. *Bydalek v. Brines,* 29 S.W.3d 848, 855[6] (Mo.App.2000). Whether ambiguity exists in a written instrument is measured by a "reasonable person" standard, that is, "ambiguity exists if reasonable people may fairly and honestly differ in the reading of the terms because the terms are susceptible of more than one meaning." *Id.* at 855[7].

■ However, a written document is not ambiguous simply because litigants disagree over its meaning. *Id.* at 855[8]. Moreover, if a document is clear and unambiguous on its face, it is not open to judicial interpretation or construction. *Id.* at 855[10].

■ In analyzing claims of document ambiguity, effect must be given to every part of the document when fairly and reasonably possible. *Id.* at 855[9]. In addition,

> " '[t]he cardinal principle for contract interpretation is to ascertain the intention of the parties and give effect to that intent.' We use the plain,

ordinary and usual meaning of the contract's words and consider the document as a whole. Each term and clause is construed to avoid an effect that renders other terms and provisions meaningless. A construction attributing a reasonable meaning to each phrase and clause, and harmonizing all provision of the agreement is preferred to one that leaves some of the provisions without function or sense."

*State ex rel. Mo. Hwy. and Transp. Comm'n. v. Maryville Land Partnership,* 62 S.W.3d 485, 491–92 (Mo.App.2001) (citations omitted).

When the first four lines of paragraph 2 of the Document are read alone—as Ken urges—they clearly direct an *immediate* transfer of $300,000 to "an account in Aspen to Ken Creviston." However, those four lines do not stand alone.

Continuing, when paragraph 1 is read with the first four lines of paragraph 2, it become less clear what Limbaugh intended regarding Ken's account. Did he want Ken's account established concurrently with the Document, or "immediately" after Limbaugh's death? Limbaugh's intent becomes clouded because paragraph 1 directs Defendants to "immediately" take $80,000 from Limbaugh's "loan" at Limbaugh's death and "use it . . . for Gary." Paragraph 2 then starts with "[a]lso . . . please immediately take from Aspen $300,000.00 [and] transfer it to an account in Aspen to Ken Creviston."

Defendants argue that Limbaugh's use of the word "immediately" in both paragraphs 1 and 2 and use of the word "also" at the beginning of paragraph 2 tie the two provisions together, thus showing Lim-

---

6. *See, e.g., Tuttle v. Muenks,* 21 S.W.3d 6, 9[4] (Mo.App.2000) (holding where a contract is ambiguous, a fact question arises as to the parties' intent as to its meaning; in such instance, it is error to grant summary judgment).

baugh's intent that neither transfer was to occur until "immediately" after his death. Contrarily, Ken asserts that paragraph 1 and the first part of paragraph 2 show Limbaugh wanted Jackson's account established after Limbaugh's death (because he clearly said so in paragraph 1), and that omission from paragraph 2 of the phrase "[i]n the event of my death[ ]" shows Limbaugh wanted Ken's account set up when the Document was signed.

 We need not decide, however, if reasonable people could fairly and honestly read paragraph 1 and the first part of paragraph 2 as the respective litigants suggest, thus making the Document ambiguous. This is because paragraph 1 and the first four lines of paragraph 2 do not stand alone. There are four additional relevant lines in paragraph 2 and they remind us that " '[e]ven seeming contradictions must be harmonized away if that be reasonably possible.' " *J.E. Hathman, Inc. v. Sigma Alpha Epsilon Club*, 491 S.W.2d 261, 264[9] (Mo.banc 1973).

We find the last part of paragraph 2 clarifies Limbaugh's intent and makes it reasonably possible to harmonize the seeming contradictions between paragraphs 1 and 2. Specifically, we refer to the following:

> "Please handle these things immediately and privately as long as I have this much money *$380,000.00* loaned to Aspen. If my loan to Aspen is depleted, then this request is cancelled."

Ken concedes in his brief that Aspen's loan obligation to Limbaugh exceeded $1,400,000 in February 1993. As such, an ample loan balance due Limbaugh from Aspen existed to fund the immediate creation of a $300,000 account for Ken; consequently, mention in the Document of an account for Ken was not necessary *if* Limbaugh wanted the account set up in February 1993. He could have accomplished

that himself, without enlisting Defendants to do so via the Document.

More than that, if Limbaugh wanted that result, i.e., for *Defendants* to handle the transfer of $300,000 for Ken's benefit in February 1993, then it served no purpose and made no sense for Limbaugh to use $380,000 as a contingency figure in the Document. To explain, if Limbaugh wanted Defendants to immediately create Ken's $300,000 account, but wait until his (Limbaugh's) death to establish Jackson's $80,000 account at Aspen, then logically he would have set the contingency figure at $80,000. This follows because Limbaugh would have known a $300,000 transfer for Ken in February 1993 would be covered, but would have had no way of knowing if Aspen might owe him as much as $80,000 at his death.

The last sentence of paragraph 2—which contains the "depletion" and "cancellation" provisos—further clarifies Limbaugh's intent. Had Limbaugh wanted Defendants to create a $300,000 account for Ken in February 1993, i.e., coincident with the Document, then putting "depletion" and "cancellation" clauses in paragraph 2 would have been meaningless and illogical, especially when coupled with Limbaugh's use of $380,000 as his "proviso" figure. If Limbaugh wanted Ken's account set up in February 1993, the "depletion" and "cancellation" sentence could only have meaning if put in paragraph 1, with the proviso figure set at $80,000.

In sum, we find that Limbaugh's $380,000 proviso in paragraph 2, his inclusion of the "depletion" and "cancellation" language in that paragraph, his use of "also" as a lead-in to paragraph 2, his use of "immediately" in both paragraphs, and his failure to personally create an account for Ken in February 1993, clearly evidence Limbaugh's intent that Defendants should

await his death, then verify if Aspen owed Limbaugh as much as $380,000, and if so, make both transfers "immediately" after his death. As such, it clearly appears that the attempted disposition of $300,000 for Ken was testamentary in character and hence invalid due to lack of compliance with the formalities of a will. *See, e.g., Truax v. Southwestern College*, 214 Kan. 873, 522 P.2d 412 (1974); *Jenkins v. Meyer*, 380 S.W.2d 315, 323 (Mo.1964), *overruled on other grounds by In re Estate of LaGarce*, 487 S.W.2d 493, 501 (Mo.banc 1972).

Defendants' first affirmative defense, i.e., that the Document lacked validity because it was an attempt at a testamentary disposition without the formalities of a will, supports summary judgment for Defendants on Ken's claims. Ken's Point I claim to the contrary lacks merit.

### Point II: Summary Judgment On Ken's Debt To Biggins

Ken's second point urges reversal of the summary judgment for Biggins on Biggins' counterclaim against Ken. He insists reversal is mandated because Biggins' summary judgment motion "did not address Ken's affirmative defenses, nor did it demonstrate the lack of a genuine issue of material facts regarding the same."[7] The problem with Ken's Point II argument is that his affirmative defenses had potential viability *only if* the Document was valid.

To explain, when Ken answered Biggins' allegations of undisputed facts as listed in Biggins' motion for summary judgment, he (Ken) admitted borrowing $15,000 from Biggins and it had not been repaid. Ken denied, however, owing Biggins anything on the note because "[a]ny obligation of [Ken] to Biggins would be more than offset by the greater amount owed by Biggins to [Ken]." Ken supported his offset allegation by citing the Document, but nothing else.

Earlier, we found the Document lacked validity because it was an attempt at a testamentary disposition without the formalities of a will. Since every one of Ken's affirmative defenses to Biggins' promissory note counterclaim were dependent upon the enforceability of the Document, our earlier decision that the Document lacked validity necessarily means that Ken's affirmative defenses lacked viability. On this record, once the non-viability of Ken's defenses was shown, Biggins' right to summary judgment was established. *See ITT*, 854 S.W.2d at 381. Point II is denied.

### Point III: Ken's Alleged Due Process Violations

 Ken's third and final point asserts that entry of summary judgment for Defendants violated his constitutionally guaranteed right to due process, thus mandating reversal. He notes that Defendants' summary judgment motion had ninety paragraphs of alleged "undisputed facts," over 400 pages of supporting documents, and at least eight alternative theories in defense of Ken's lawsuit, yet neither the facts nor the supporting documents focused on or were tied to a specific defense. Additionally, Ken points out that the trial judge did not specify in the summary judgment which of the multiple alternative defenses was the basis for his ruling.

 Ken also correctly observes that Rule 74.04 requires specificity and particularity in summary judgment practice; accordingly, it is not the duty of this court, nor the duty of the non-movant, to sift through a voluminous record to try to sort

---

7. To support that argument he cites *ITT*, 854 S.W.2d at 381 (holding "a claimant moving for summary judgment in the face of an affirmative defense must also establish that the affirmative defense fails as a matter of law").

out material facts from the immaterial. *Moore Equip. Co. v. Halferty,* 980 S.W.2d 578, 585[6] (Mo.App.1998). From the foregoing, he makes the conclusory argument that to deny him a right to trial "where the basis for summary judgment is unclear and uncertain, coupled with the fact the trial court's order can be affirmed on an entirely different basis than that posited at trial," violates his constitutional due process rights and runs afoul of Article I, Section 14 of the Missouri Constitution "by ... denying access to the courts and the opportunity for an effective, focused appeal."

Ken's assertion that on this record we could affirm the summary judgment "on an entirely different basis than that posited at trial" is simply wrong. Although it is true a non-movant's due process rights (as guaranteed by Rule 74.04) are violated if a summary judgment is entered or affirmed based, in whole or part, on matters clearly outside the summary judgment record made by the parties and as authorized by Rule 74.04 (*Cody v. Mo. Brd. of Prob. and Parole,* 111 S.W.3d 547, 552 (Mo.App. 2003); *Lawrey v. Reliance Ins. Co.,* 26 S.W.3d 857, 864 (Mo.App.2000)), *that did not happen here.* To the contrary, Defendants' summary judgment motion met the literal requirements of Rule 74.04(c)(1) and Ken has never argued otherwise.[8] He simply says his due process rights were violated because (a) Defendants did not spell out which undisputed facts allegedly supported which defense, (b) the trial court did not specify which one or more of Defendants' theories it found viable, and (c) in some unexplained way this court is left free to affirm "on an entirely different

basis than that posited at trial." The fallacy of this argument is shown in three ways.

■■ First, due process safeguards are provided in Rule 74.04. *See Cody,* 111 S.W.3d at 552. Accordingly, if a moving party, after complying with Rule 74.04's requirements, shows he or she has an "undisputed right to judgment as a matter of law," *ITT,* 854 S.W.2d at 380[12], then summary judgment is proper and there is no denial of due process. *Henkel v. City of Pevely,* 504 S.W.2d 141, 149[9] (Mo.App. 1973). That is the situation here.

Second, Ken was not "blindsided" by Defendants' failure to designate which of their undisputed fact allegations they claimed supported which defense. *Cf. Lawrey,* 26 S.W.3d at 864. To the contrary, Ken fully responded to everything in the summary judgment record, both before the trial judge and before this court.

Third, this court's decisions on Points I and II of Ken's brief clearly show an affirmance grounded solely on a theory pled in Defendants' motion and supported by the summary judgment record. In such an instance, there is no due process violation and we are to affirm. *In re Estate of Blodgett,* 95 S.W.3d 79, 81 (Mo.banc 2003); *Henkel,* 504 S.W.2d at 149[9]. Point III is denied.

The judgment of the trial court is affirmed.

BARNEY, J., and BATES, C.J., concur.

---

8. Specifically, Defendants' motion (a) summarily stated the legal basis for the motion, (b) set out with particularity in separately number paragraphs each material fact as to which they claimed there was no genuine issue, (c) made specific references to the pleadings, discovery, exhibits, or affidavits that they claimed demonstrated the lack of a genuine issue as to such facts, and (d) attached to their statement a copy of all discovery, exhibits, or affidavits on which their motion relied.