**Warren K. BOWERS and Nona S. Bowers, Personal Representatives of the Estate of William C. Markwardt, Deceased, Plaintiffs–Respondents,**

v.

**Jean JONES, Defendant–Appellant.**

**No. 17802.**

Missouri Court of Appeals,
Southern District,
Division One.

Oct. 14, 1992.

Motion for Rehearing or Transfer
Denied Nov. 5, 1992.

Application to Transfer Denied
Dec. 18, 1992.

James R. Spradling, Carthage, for defendant-appellant.

Preston H. Longino, Raytown, for plaintiffs-respondents.

SHRUM, Judge.

In this action, originally filed by William C. Markwardt, now deceased, the trial court entered a money judgment against Jean Jones, after concluding that the filing of this lawsuit terminated the joint tenancy in certain savings association accounts titled in the names of William and Jean thereby preventing the funds in those accounts from passing to Jean upon William's death. That trial court conclusion foretold the sole issue on appeal.

## STANDARD OF REVIEW AND DECISION

Under Rule 73.01(c), we must affirm the trial court's judgment unless there is no substantial evidence to support it, it is against the weight of the evidence, or the trial court erroneously declared or applied the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). Because the trial court erroneously declared the law in this case, we reverse the judgment and remand with directions.

## FACTS

William[1] lived in Joplin, Missouri, from 1918 until 1968, during which time he operated a bakery. Jean worked for William as his bookkeeper and secretary for 52 years.

In 1968 William and his wife Blanche moved to Colorado. Jean remained in Joplin and continued to work for William who maintained a Joplin address. Blanche died in Colorado on April 8, 1983.

Beginning in 1979 and continuing through May 1983, William opened accounts in his and Jean's names at Capitol Federal Savings in Denver. Beginning in 1980, William opened accounts in his and Jean's names at Farm and Home Savings Association in Joplin. Jean retained possession of the certificates and a passbook representing the Capitol Federal and Farm and Home accounts.

In September 1983, William moved to Kansas City, Missouri, where his daughter Lois Anne lived.[2] On November 14, 1983, William filed this lawsuit against Jean Jones. In Count I, William alleged that Jean "by the use of undue influence, coercion, and fraud caused [him] to transfer savings accounts belonging to him in Farm

---

1. For convenience, we refer to William C. Markwardt as "William"; the appellant Jean Jones as "Jean"; and Warren K. Bowers and Nona S. Bowers as "the respondents."

2. Lois Anne died in 1986. William and Blanche's only other child died in 1972. William's only surviving heir is Lois Anne's daughter.

and Home ... into joint names with [Jean]...." In Count II, William alleged that Jean "by the use of undue influence, coercion and fraud caused [him] to transfer savings accounts belonging to him in Capitol Federal ... into joint names with [Jean]...." [3] In both counts, William sought what we take to be a declaration that he was sole owner of the Farm and Home and Capitol Federal accounts and an order that Jean deliver to him all certificates, passbooks, and any other tangible evidence of those accounts.[4]

In May 1985, William was declared incompetent; one year later the respondent Warren K. Bowers, guardian for William, was substituted as plaintiff in this action. After William died in May 1988, both respondents, as personal representatives of his estate, were substituted as plaintiffs.

At the March 1991 trial, Jean, by then age 82, admitted she contributed nothing to the accounts in dispute. She testified that, on an unspecified date after the lawsuit was filed, she had the Farm and Home accounts "put in [her] name." In July 1986, she closed the accounts at Capitol Federal and used the proceeds to open accounts in Missouri bearing her name alone.

After all evidence had been presented, the judge stated that the respondents "did not make [their] case ... didn't get any really effective evidence in on the allegations of ... undue influence, coercion, and fraud.... I believe the proof fails as to undue influence, fraud, or coercion in any aspect of it."

Following trial, the court allowed the respondents to file their "Second Amended Petition to Conform to Proof at Trial" to allege that William and Jean were "joint tenants of the [accounts] with the right of survivorship," that William furnished all the funds for the accounts, that Jean gave no consideration in exchange for William's placing her name on the accounts, and that William had demanded the return of the funds in the accounts.

The court entered judgment against Jean in amounts of $64,500 under Count I, $94,500 under Count II, and interest on each amount calculated at 9 percent from the date the original petition was filed.

The trial court issued conclusions of law, including the following:

3. The court concludes that the instant lawsuit filed in 1983 and signed by William Markwardt evidenced by its plain language and meaning that William Markwardt meant to revoke the joint bank accounts listed in the Petition.

....

5. ... The court concludes that the filing of the instant lawsuit was sufficient to freeze the accounts and to prevent the amounts contained therein from passing to the survivor, Defendant Jean Jones, on William Markwardt's death.

Jean appeals from the portions of the judgment adverse to her.

## DISCUSSION AND ANALYSIS

### Choice of Law

■ The parties and the trial court relied on Missouri law as applicable, even regarding the funds that originally were in the Colorado accounts. Based on the record before us, we agree that Missouri law applies to the case in its entirety.

Missouri has adopted the "most significant relationship" test articulated in *Restatement (Second) of Conflict of Laws* in resolving choice of law questions concerning torts, *Kennedy v. Dixon*, 439 S.W.2d 173, 184[6] (Mo. banc 1969), and contracts, *National Starch and Chemical Corp. v. Newman*, 577 S.W.2d 99, 102-03[1,2] (Mo. App.1978). We believe the Restatement test also is appropriate to determine any choice of law questions in the case before us.

Although the Colorado accounts were created by William while he was domiciled in Colorado, Jean retained possession of the certificates and passbook in Missouri; the

---

3. As of September 30, 1983, the Farm and Home accounts consisted of certificates of deposit totaling $64,500. As of October 26, 1983, the Capitol Federal accounts consisted of certificates totaling $91,000 and a passbook savings account of approximately $5,000.

4. In Count III, William sought to set aside a deed by which he and his wife Blanche conveyed Colorado real estate to Jean. The trial court found in favor of Jean on Count III, and the Colorado real estate is not at issue on appeal.

act which the respondents contend terminated the joint tenancy—the filing of this lawsuit—occurred in Missouri; both William and Jean were domiciled in Missouri when the suit was filed and at all times thereafter; Jean's refusal to deliver the certificates, passbook, and money occurred in Missouri; and, after she closed the Colorado accounts, Jean moved the money to Missouri. Arguably, Missouri had "the most significant relationship to the thing and the parties" at all times; certainly, after Jean closed the Colorado accounts and moved the money to Missouri, this state had the only significant relationship. Hence, it is proper that the law of Missouri be applied to determine all issues. *Restatement (Second) of Conflict of Laws*, §§ 222 and 6 (1971).

We recognize the principle that "it is generally agreed that the 'determination of the title to and the rights in a deposit standing in the name of the depositor and another is governed by the law of the state where the deposit has been made and the account has been kept.'" *Riggio v. Southwest Bank of St. Louis*, 815 S.W.2d 51, 53[1] (Mo.App.1991) (quoting *Melton v.*

*Ensley*, 421 S.W.2d 44, 53[15] (Mo.App. 1967) and citing 10 Am.Jur.2d *Banks* § 376 (1963)). However, this general principle alone would not require Colorado law to govern where, as here, the accounts are no longer "kept" in that state.

*Termination of Joint Tenancy*

■ The record is silent about the language used to establish the disputed accounts. However, the trial court found—and the parties agree—that William and Jean initially held the accounts as "joint tenants with the right of survivorship."

Joint deposits in savings associations are the subject of § 369.174.[5] In a landmark decision concerning joint deposits, the Missouri Supreme Court, in *In Re Estate of LaGarce*, 487 S.W.2d 493 (Mo. banc 1972), expressed its view that § 369.150, RSMo 1969, the predecessor to § 369.174, created "what might be described as a statutory joint tenancy which should be given effect without consideration of the strict common-law requirements" for creation of a joint tenancy.[6] 487 S.W.2d at 500[2].

In the case before us, the trial court correctly recognized William's right as sole

---

**5.** All statutory references are to RSMo 1986, unless otherwise indicated. Section 369.174 provides in pertinent part:

> 1. When an account is opened or maintained in an association in the names of two or more persons, whether minor or adult, as joint tenants or in form to be paid to any of them or the survivor of them and whether or not the names are stated in the conjunctive or the disjunctive or otherwise, the account and all additions thereto shall be the property of such persons as joint tenants. The moneys in the account and all earnings on the account may be paid to any one of such persons during his lifetime or to any one of the survivors of them after the death of any one or more of them. The opening or maintenance of the account in such form, in the absence of fraud or undue influence, shall be conclusive evidence in any action or proceeding to which the association or any survivor or the personal representative of a deceased owner is a party of the intention of all the parties to the account to vest title to the account and the additions and earnings thereto in the survivor. A person may be added or removed as an owner of an account upon the written direction of any owner of the account upon whose signature withdrawals may be made from the account. By written instructions of all joint tenants given to the association, they may require the signatures of more than one

of such persons during their lifetimes or of more than one of the survivors after the death of any one of them on any notice of withdrawal, request for withdrawal, check endorsement or receipt, or remove any such requirement, in which case the association shall pay withdrawals and earnings only in accordance with such instructions, but no such instructions shall limit the right of the sole survivor or of all of the survivors to receive withdrawal payments and earnings. Payment of all or any of the moneys in the account or payment of earnings thereon as provided in this section is a valid and sufficient release and discharge of the association with respect to the moneys so paid prior to receipt by the association of a written notice from any one of the account owners directing the association not to permit withdrawals or make payments in accordance with the terms of the account or the written instructions. After receipt of such notice an association may refuse without liability to honor any check, receipt or withdrawal order or pay any earnings on the account pending determination of the rights of the parties, but is not required to do so....

**6.** The *LaGarce* court's discussion of joint accounts at savings associations is equally applicable to joint bank accounts created pursuant to

contributor to terminate the joint tenancy. *See Carroll v. Hahn*, 498 S.W.2d 602 (Mo. App.1973), in which the court stated, "We believe that the legal relationship that is created by the joint account statutes is, as *LaGarce* recognized, that of a statutory testamentary transfer, but prior to death it may be revoked by the depositor who furnished the money during his lifetime." 498 S.W.2d at 607[4]. The issue before us, however, is not William's right to terminate; the issue is whether, by filing the instant lawsuit, he did, in fact, terminate the joint tenancy.

Section 369.174 does not prescribe a procedure by which the sole contributor can terminate the statutory joint tenancy created by compliance with the statute's terms. However, guidance is available from a series of Missouri appellate court opinions concerning termination of statutory joint tenancies in bank and savings association accounts and from the language of § 369.-174.1.

It is clear from *LaGarce* that "actual termination" by the sole contributor is required; an "intent to terminate" is not sufficient. 487 S.W.2d at 501[5]. The supreme court restated this distinction in *McGee v. St. Francois County Sav. and Loan Ass'n*, 559 S.W.2d 184 (Mo. banc 1977) as the difference between "a contemplated act" and "a completed act." *Id.* at 188.

A review of case law provides examples of completed acts by the sole contributor that will terminate a statutory joint tenancy. One such act would be a "cashing in of the certificate." *McGee*, 559 S.W.2d at 187. Various forms of "cashing in" include surrender of the certificate by the sole contributor and the issuing of a new certificate in his name alone, *In re Estate of Hampton*, 547 S.W.2d 886, 887 (Mo.App.1977), and the withdrawal of all funds from a joint savings account by the sole contributor and his funding of another account in his name and the name of a third party, *Carroll*, 498 S.W.2d at 607[7]. "Cashing in" may be accomplished by the guardian for the sole

contributor who has become incompetent. *Estate of Thompson*, 539 S.W.2d 650, 652[2] (Mo.App.1976).

In addition to "cashing in" a certificate or withdrawing all the funds from a passbook account, a sole contributor can terminate the statutory joint tenancy by having the bank or savings association make physical changes on the certificate or passbook (or other tangible representation of the account) and corresponding changes in the institution's records. *See, e.g., McGee*, 559 S.W.2d at 185–88[2, 3]; *Peterson v. Mercantile Bank of Sedalia*, 827 S.W.2d 729, 730–31 (Mo.App.1992); *Jackson Savings & Loan Ass'n v. Seabaugh*, 395 S.W.2d 260, 262–64 (Mo.App.1965).

The holdings in the above cited cases are consistent with language from § 369.174.1: "The opening or maintenance of the account in [the statutorily prescribed] form ... shall be conclusive evidence ... of the intention of all the parties to the account to vest title to the account and the additions and earnings thereto in the survivor." In light of the testamentary nature of the statutory joint tenancy, if the sole contributor withdraws all the funds from the account or has a representative of the bank or association make physical changes on a certificate, passbook, or other tangible representation of the account and corresponding changes in the institution's records, the account is no longer maintained in statutory form and the statutory joint tenancy is terminated. Because William had not retained possession of the certificates and passbook representing the accounts, he was unable to terminate the joint tenancies by these methods.

Another method of terminating a statutory joint tenancy in a bank or savings association account is to obtain a final judgment ordering termination. The respondents contend the requirement that there be a judgment is inappropriate in this case, arguing that *Sentinel Federal Sav. & Loan Ass'n v. Jones*, 823 S.W.2d 105 (Mo. App.1991), relied on by Jean, is distinguishable.

§ 362.470, RSMO 1986. *LaGarce*, 487 S.W.2d at 499; *Pollock v. Brown*, 569 S.W.2d 724, 731[7]

(Mo. banc 1978).

In *Sentinel Federal,* John K. Martin provided the funds to establish three joint deposit accounts—two represented by certificates of deposit and one by a passbook—with Delores Jones named as one of several joint tenants. Delores kept the passbook and one certificate in her possession. Fearing that Delores intended to withdraw the funds, Martin asked Sentinel to "freeze" the funds pursuant to § 369.174, and his attorney requested Sentinel to institute an interpleader action so that a court could determine ownership of the accounts. Sentinel filed the requested interpleader action, and the court ordered Sentinel to pay the passbook funds to the administrator of the circuit court and to reissue the certificates in the name of the court administrator. Two days later Martin died. 823 S.W.2d at 107.

The trial court concluded that because Martin did not have the passbook and one of the certificates in his possession, "[a]ll he could do then was ask to have the accounts frozen. Under *Home Savings Association v. Bratton,* 721 S.W.2d 40 (Mo. App.1986), that action was sufficient to sever the joint tenancy." The trial court awarded the funds in the accounts to Martin's estate. 823 S.W.2d at 107.

The court of appeals reversed the judgment and remanded with directions that the trial court enter a judgment declaring the surviving joint tenants to be owners of the accounts. 823 S.W.2d at 109. After pointing out that the trial court had misread *Bratton,* the court of appeals explained:

> Because Martin's freeze order merely suspended any action on the accounts by the joint tenants, Sentinel took the next appropriate step in determining ownership rights: It filed an interpleader action. That action did not abrogate anybody's title in the certificates or accounts. It merely allowed a court to determine who had a right to the funds held by Sentinel. Pendency of an interpleader action, without a judgment, does not terminate a joint tenancy.

823 S.W.2d at 108.

The respondents attempt to distinguish *Sentinel Federal* from this case by pointing out that the suit here is between the sole contributor to the accounts and the noncontributing joint tenant, whereas in *Sentinel Federal* the savings and loan association brought the action. The respondents, in their brief and at oral argument, do not convince us that this factual difference is meaningful, and we see no significance in the distinction for purposes of this case. In this case as in *Sentinel Federal,* the sole contributor, by causing suit to be filed, expressed an intention that the joint tenancy be terminated. An intent to terminate, however, cannot be equated with actual termination. *LaGarce,* 487 S.W.2d at 501[5]; *McGee,* 559 S.W.2d at 188.

An expression of an intention to terminate a statutory joint tenancy, no matter how eloquently or forcefully stated, cannot overcome the presumption that arises from compliance with § 369.174.1: "The opening or maintenance of the account in [the statutorily prescribed] form ... shall be *conclusive evidence* ... of the intention of all the parties to the account to vest title to the account and the additions and earnings thereto in the survivor (our emphasis)." As is the case with allegations of fraud or undue influence, only after hearing evidence can a trial court determine whether the statutorily presumed "conclusive evidence" has been overcome. Because William's lawsuit did not reach final judgment prior to his death, the presumption that he intended that title to the accounts vest in Jean remained intact.

We hold that, as matter of law, the joint tenancies in the disputed accounts were not terminated by William when he filed this lawsuit. We reverse the judgment and remand the cause to the trial court with directions that it enter judgment for Jean Jones on all counts.

PARRISH, C.J., and CROW, P.J., concur.