The **ESTATE OF Marie MUNIER, by Her Personal Representative Marlene GARGER, Plaintiff/Appellant,**

v.

Arthur **JACQUEMIN, et al., Defendants/Respondents.**

No. 66029.

Missouri Court of Appeals,
Eastern District,
Division Six.

April 11, 1995.

Motion for Rehearing and/or Transfer to Supreme Court Denied May 31, 1995.

Michael A. Forst, St. Louis, for appellant.

Charles R. Schroeder, St. Peters, for respondents.

1. Marie Munier filed her petition in June, 1992. She died on February 6, 1993. On March 26, 1993, her estate was substituted for her as a

GRIMM, Chief Judge.

Plaintiff[1] furnished the funds for several certificates of deposit. The certificates were titled in her name, along with that of defendants, her sister and her sister's husband. Defendants kept the certificates in their safe deposit box. Plaintiff asked for their return. When they refused to return them, she filed this action.

Plaintiff died while the action was pending. Defendants claimed the certificates as surviving joint tenants. The trial court agreed. We disagree and enter judgment accordingly.

## I.  Background

The facts are basically not disputed. Plaintiff was born in 1903. When she was 19 years old, she began working at Bussmann Manufacturing. She worked there as a file clerk until she retired at age 74. She never married and had no children.

During her years at Bussmann, she purchased Bussmann stock. When she retired in 1977, she sold her stock and purchased certificates of deposit. All the money used for purchasing the certificates was plaintiff's.

The original certificates are not before us. However, plaintiff's testimony reveals that they, as well as subsequent certificates, were titled in her name along with the names of defendants as joint tenants with right of survivorship and not as tenants in common.

Plaintiff put the other names on the certificates in "case anything happened to [her] they could have them." She did not intend to make a gift of the certificates "until [she] died." She "thought they were just mine. That [she] could get them [herself], you know."

Defendants admit they never received any interest on the certificates, nor did they report any on their income tax returns. Rather, all interest was paid to plaintiff and she reported it on her income tax returns.

The certificates were never in plaintiff's possession. They were always in defendants' safe deposit box. Only defendants and two

party. For ease of reading, we refer to Ms. Munier as plaintiff.

of their children had access to the safe deposit box.

The testimony concerning why the certificates were placed in defendants' safe deposit box is confusing. Plaintiff said she let sister's husband keep them; "[h]e had a safety deposit box and I didn't." Sister testified they kept the certificates "in our safe deposit box because [plaintiff] asked me to put them in there."

However, sister's husband testified otherwise. When asked, "Whose idea was that to keep them [in the safe deposit box]?", he replied: "Mine. I was in charge of them. I had to protect them." He was then asked, "Protect them from whom?" He said "Anybody."

The certificates were in the safe deposit box until defendants moved to St. Peters. This move apparently occurred in the summer of 1992. At that time, sister's husband removed them from the safe deposit box and kept them at his home.

Although defendants had possession of the certificates, they had released one to plaintiff earlier. Around 1989 or 1990, she wanted to loan $10,000 to a friend. Plaintiff asked for a $10,000 certificate. Sister's husband tried to talk her out of it. According to him,

> She got mad. [She said] [i]f you don't get it, I will go down to the bank myself and get it. I didn't tell her, but I had the certificate. I knew she couldn't do it, so my wife and I talked it over, and we decided it's her money, what could we do. She is going to lose ten thousand, but that's the ballgame. So I went down and got it out, drew it, gave her a check.

Plaintiff testified that she made the loan and it was repaid.

Sometime before April 2, 1992, plaintiff phoned sister's husband and asked for the certificates. He testified that plaintiff said "I want you to turn over the certificates to me." He replied, "I am not going to do it."

On April 2, 1992, plaintiff went to United Postal Savings. At that time, she had six certificates there totaling $80,000. Plaintiff wanted to withdraw the funds, but an employee told her she could not without presenting the certificates. Plaintiff became up-

set "because she was afraid she was going to need the money to take care of herself."

The employee suggested she sign a form that would prohibit anyone from cashing in the certificates without an agreement of all parties. Plaintiff signed such a form for each of the six certificates. According to employee, United Postal's policy prevented plaintiff from doing anything else to obtain the funds or change the names on the certificates.

The next day, April 3, plaintiff went to Roosevelt Bank. At that time, she had three certificates there totaling $30,000. She attempted to cash the certificates and she had the same result. She signed similar forms which prohibited the cashing of the certificates without an agreement of all.

On April 24, plaintiff's attorney wrote defendants asking for the certificates. Apparently when attorney did not receive a response, attorney phoned sister's husband. Sister's husband said: "I am not going to give [them] to her." He told attorney that he thought plaintiff would give the certificates to a niece.

Sister acknowledged that plaintiff wanted the certificates. She testified:

Q  There was no doubt in your mind that [plaintiff] wanted the certificates back?

A  Oh, yes, I know.

Q  You refused to give her—

A  I didn't refuse. He refused.

Q  Why didn't you go to the banks and give them to her?

A  I have to go by what my husband says.

Further, sister's husband testified:

Q  If [plaintiff] wanted to loan some money to [a friend] last year, would you return the certificates over to her?

A  If she insisted on it, yes, they were hers.

Q  If she wanted to pay some extraordinary medical bills during 1992, would you return the certificates over to her?

A  Yes, that would be a need.

Q  In fact, you had to decide what [plaintiff] would do with her money; is that right?

A  That's right.

On June 24, 1992, plaintiff filed suit against sister's husband. Thereafter, an amended petition was filed adding sister as a defendant. As previously indicated, plaintiff died on February 6, 1993. Within a week of her death, defendants attempted to cash the certificates. Both institutions refused. Although the trial court awarded the certificates to defendants, the court ordered them not to transfer or dissipate the funds until all appeal rights were exhausted.

## II. Application of § 369.174 and 362.470 [2]

Plaintiff raises three points on appeal. One is dispositive. She alleges the trial court erred by misapplying §§ 369.174 and 362.470 to these certificates of deposit.

The certificates issued by United Postal Savings are governed by § 369.174. The pertinent part of that section states:

> The opening or maintenance of the account in such form, in the absence of fraud or undue influence, shall be conclusive evidence in any action or proceeding to which the association or any survivor or the personal representative of a deceased owner is a party of the intention of all the parties to the account to vest title to the account and the additions and earnings thereto in the survivor.

Section 362.470, which controls the certificates issued by Roosevelt Bank, is almost identical. "For the convenience of the public, financial institutions, and the bar, courts should interpret these two statutes similarly." *Maudlin v. Lang*, 867 S.W.2d 514, 516 (Mo. banc 1993).

When one contributes all the funds deposited in a joint account, so long as that person lives, that person has the power to divest the interests of non-contributing joint tenants by transferring the funds to a new account. *Carroll v. Hahn*, 498 S.W.2d 602, 607 (Mo.App.E.D.1973); *Auffert v. Auffert*, 829 S.W.2d 95, 98 (Mo.App.W.D.1992). The "one who has deposited none of the funds [is subject] to accountability and liability." *Carroll*, 498 S.W.2d at 607.

Here, there is no dispute that plaintiff contributed all the funds to the joint account. Defendants are subject to "accountability and liability." *See id.*

Plaintiff, before April 2, 1992, sought to divest defendants from the accounts. She asked them for the certificates. She went to the savings and loan offices seeking to change the certificates and then "froze" the accounts. She had an attorney write a letter asking for the certificates. When all these steps failed, she filed suit.

Plaintiff's, sister's, and sister's husband's depositions, as introduced in evidence, all reflect that the facts are undisputed. Defendants simply refused to return the certificates out of fear that plaintiff would put niece's name on them and the accounts would go to her instead of them.

If we were to affirm the trial court, defendants would be rewarded for their wrongful withholding of the certificates. Plaintiff was entitled to the certificates. Further, by affirming, we would be sending a message to others like defendants that they should refuse, stall, and delay in the hope that the real owner's death will reward them financially. This we cannot do.

Defendants point to cases which they argue require us to affirm. They contend that "the facts of this case are indistinguishable from *Bowers v. Jones*," 841 S.W.2d 744 (Mo.App.S.D.1992). We disagree.

In *Bowers*, deceased opened several accounts utilizing his own money. The certificates and passbook were titled jointly with Jean Jones, and she retained possession of them. Bowers filed suit in November, 1983, and died while the suit was pending.

Several facts distinguish *Bowers*. The *Bowers* opinion does not reflect that deceased ever asked Jones for the certificates before filing suit. Nor does it indicate that deceased ever went to the institutions to try and change the accounts. Nor did deceased sign a form that would prohibit Jones from cashing in the certificates without his agreement. As a result of deceased's failure to "freeze" the accounts by signing a prohibition

---

2. All statutory references are to RSMo 1994.

form, Jones cashed in the accounts while the matter was pending.

*Bowers* held that "the joint tenancies in the disputed accounts were not terminated when he filed this lawsuit." *Id.* at 749. However, as pointed out above, plaintiff here took additional steps which takes this case out from under the *Bowers* holding.

Defendants also rely on *In re Estate of LaGarce,* 487 S.W.2d 493 (Mo. banc 1972). In *LaGarce,* a discovery of assets case, decedent opened an account on August 21, 1969. Unlike the facts before us, he and the joint tenants signed an agreement with the institution at that time. That agreement provided any funds deposited into the account "*shall be conclusively intended to be a gift* at that time of such funds to the other signatory party or parties to the extent of his or their pro rata interest in the account." *Id.* at 495 (emphasis added).

On October 3, 1969, decedent called one of the joint tenants. He advised the joint tenant that his wife would return to him if he "put her name on all his property." *Id.* at 496. The joint tenant asked if he was calling to have the certificate returned. Decedent replied " 'that wasn't the way he wanted things, but that he was very sick' and needed someone to take care of him." *Id.*

The joint tenants decided to make the certificate available to decedent by taking it to an attorney. On October 7, they gave the certificate to the attorney and instructed him to give the certificate to decedent "and only to him." *Id.* Decedent did not personally take any steps to claim the certificate. He died on October 9 without claiming the certificate.

The issue in *LaGarce* was whether a valid joint tenancy had been created. *Id.* at 498. The court then discussed at length the common law concepts of joint tenancy and those created by statute. Although it recognized that a joint tenancy account "is somewhat of a testamentary nature," the court saw no reason why the statute of wills should prevail over the joint deposits statute. *Id.* at 501.

Although the *LaGarce* opinion contains broad language, it must be construed in light of the facts before the court. As the court

noted, "[a]t most, the evidence shows an intent by the [joint tenants], for a short period of time, to return the certificate, and an intent to terminate or sever the joint tenancy and not an actual severance." *Id.*

Here, unlike *LaGarce,* plaintiff personally took various steps to obtain the certificates. She called defendants and asked for the certificates; went to the institutions and attempted to change the title to them; "froze" the certificates; had an attorney write a letter and phone defendants asking for the certificates; had her attorney file suit; and gave deposition testimony about three months before her death seeking the certificates' return. On the facts before us, *LaGarce* does not require us to reward defendants for their refusal to turn over the certificates to plaintiff.

Finally, defendants rely on *Maudlin v. Lang,* 867 S.W.2d 514 (Mo. banc 1993). *Maudlin* is not applicable. Nothing in that opinion even so much as suggests that the creator of the joint accounts ever wanted to rescind her actions.

■ Sections 369.174 and 362.470 clearly vest title of a joint account in the survivors. However, where, as here, a person who contributed all funds to the account takes all possible steps to change the certificates' title and is prevented from succeeding only by her death, as between the named joint tenants on the certificates, nothing in the statute precludes holding those who have not deposited any funds accountable. In this regard, the trial court misapplied the law. *See Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976).

Rule 84.14 directs appellate courts to "give such judgment as the court ought to give" and "dispose finally of the case." Here, the facts are not disputed. Thus, pursuant to Rule 84.14, we reverse the trial court's judgment and enter judgment for plaintiff and against defendants.

CRANDALL and WHITE, JJ., concur.