**Robert J. BURKHOLDER, Deceased, by His Personal Representative, Larry BURKHOLDER, Respondent,**

v.

**Edward G. BURKHOLDER, Appellant.**

**and**

**Edward G. Burkholder, Appellant,**

v.

**William L. Burkholder, Individually, and as Personal Representative of the Estate of Robert J. Burkholder, Robert Burkholder, Jr. et al., Respondents.**

No. SC 82976.

Supreme Court of Missouri, En Banc.

June 12, 2001.

Rehearing Denied July 24, 2001.

Robert W. Evenson, Pineville, for Appellant.

John Sims, Neosho, for Respondents.

WHITE, Judge.

## I.

Robert J. Burkholder (R.J.) sought termination of joint tenancies held with his son, Edward Burkholder (Edward), on a certificate of deposit, a 1991 Buick automobile, and a church savings bond. While the termination action was pending, R.J. died and the personal representative of his estate was substituted as a party. Thereafter, Edward filed a separate suit contesting his father's will and alleging conversion of personal property by his brother, William Lawrence Burkholder. The cases were consolidated for trial, and the trial judge granted termination of the joint tenancies, denied Edward's claim of conversion, and upheld the validity of R.J.'s will. We affirm.

## II.

The trial court's judgment in a court-tried case may be reversed when it is not supported by substantial evidence, is against the weight of the evidence, or erroneously declares or applies the law.[1] The evidence, and permissible inferences therefrom, are viewed in the light most favor-

---

1. *Brawley v. McNary,* 811 S.W.2d 362, 371 (Mo. banc 1991), citing to, *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976). See also Rule 84.13(d).

able to the judgment disregarding all contrary evidence and inferences.[2]

With regard to Edward's point concerning the termination of the tenancies held on the automobile and the church bond, we affirm the trial court's judgment pursuant to Rule 84.16. The trial court's decision was supported by substantial evidence, was not against the weight of the evidence, and no error of law appears. A published opinion reciting the detailed facts and restating the applicable principles of law would have no precedential value.

■ Edward's point relied on regarding the claim of conversion of personal property states that, "... the evidence was that Edward Burkholder was the owner of that personal property as a result of a bill of sale given to him by R.J. Burkholder on November 11, 1992, and that William Lawrence Burkholder took possession of the property without Edward Burkholder's consent and claimed the property as his own." Appellant's point fails to cite relevant authority as required under Rule 84.04(d) and as such is not preserved for appellate review.[3]

■ This Court now addresses the issue of termination of the joint tenancy held on the certificate of deposit. It was determined in *In re Estate of LaGarce* that to terminate a joint tenancy in a savings certificate "actual termination" is required and an "intent to terminate" is not sufficient.[4] The difference between "actual termination" and "intent to terminate" has been defined as the difference between "a contemplated act" and "a completed act."[5] Satisfying the "completed act" standard can be accomplished by means other than procuring a final judgment in a termination proceeding prior to the depositor's death.[6] Where there is a sole contributor to a jointly held certificate, methods to effect an "actual termination" include: cashing the certificate[7] or surrender of the certificate by the sole contributor and the issuing of a new certificate in his name alone or in the name of a third party.[8] A sole contributor can also terminate a joint tenancy by having the bank or savings association make physical changes on the certificate, or other tangible representation of the account, with corresponding changes in the institution's records.[9]

---

**2.** *Mehra v. Mehra,* 819 S.W.2d 351, 353 (Mo. banc 1991).

**3.** Appellant's argument cited only to *Maples v. United Sav. & Loan Assoc.,* 686 S.W.2d 525 (Mo.App.1985), to questionably provide a definition of "conversion," but Appellant still failed to support his position that the facts asserted, coupled with applicable law, resulted in an unlawful conversion.

**4.** *In re Estate of LaGarce* 487 S.W.2d 493, 501 (Mo. banc 1972).

**5.** *McGee v. St. Francois County Sav. and Loan Ass'n,* 559 S.W.2d 184, 188 (Mo. banc 1977).

**6.** *Bowers v. Jones,* 841 S.W.2d 744, 748 (Mo. App.1992).

**7.** *McGee,* 559 S.W.2d at 187.

**8.** *In re Estate of Hampton,* 547 S.W.2d 886, 887 (Mo.App.1977); *Carroll v. Hahn,* 498 S.W.2d 602, 607 (Mo.App.1973); and *Estate of Thompson,* 539 S.W.2d 650, 652 (Mo.App. 1976).

**9.** *Bowers,* 841 S.W.2d at 748; *McGee,* 559 S.W.2d at 185–88; *Peterson v. Mercantile Bank of Sedalia,* 827 S.W.2d 729, 730–31 (Mo. App.1992); *Jackson Savings & Loan Ass'n v. Seabaugh,* 395 S.W.2d 260, 262–64 (Mo.App. 1965). The foregoing case determinations are consistent with the statutory language in sections 369.174 and 362.470, which allows the creation of statutory joint tenancies in joint accounts and deposits absent all four of the common-law unities traditionally required to form a joint tenancy. Consequently, the statutory joint tenancy is terminated when the account is no longer maintained in statutory form. See *LaGarce,* 487 S.W.2d at 499, and *Bowers,* 841 S.W.2d at 748.

■ Edward concedes that R.J. was the sole contributor to the $85,000 joint certificate of deposit and that R.J. had the authority to remove his son as a joint tenant.[10] Edward, however, relies on *Sentinel Federal Savings and Loan Association v. Jones*[11] and *Home Savings Association of Kansas City v. Bratton*[12] for support of the propositions that freezing an account and a lawyer's request to terminate an account are insufficient to meet the "completed act" standard of *LaGarce*. Citing to *Bowers v. Jones*, Edward further contends that the above mentioned methods for terminating a tenancy are restrictive and would not encompass the mere revocation of authority.[13] However, the methods identified in *LaGarce* and its progeny to effectuate severance of such joint tenancies do not comprise an exclusive list.

In *LaGarce*, the party wanting to terminate the joint account had only requested return of the certificate and did not sign a revocation of authority. Additionally, these parties had executed a collateral agreement at the time of opening the account stating that the joint tenants were to receive the funds as a gift.[14] Unlike in *LaGarce*, R.J. had no collateral contracts with the Bank prior to executing the revocation of authority, and he took additional steps to terminate the tenancy.

R.J. asked his son to return the certificate that had been removed from his safety-deposit box without his permission. When Edward refused, R.J. went to the bank with the intention of removing Edward's name from the account or cashing it out. Either of these actions would have, without question, severed the joint tenancy. Without physical possession of the certificate, the bank provided R.J. only one option, the execution of a revocation of authority. The revocation terminated the Bank's authority to make payments or allow withdrawals in accordance with the original terms of the certificate, but also stated the funds in the account would continue to be owned jointly and become the property of the survivor.[15] R.J. next had his attorney write a letter to Edward demanding return of the certificate and filed suit for termination of the tenancy. Edward responded by mailing a letter to the Bank stating he intended to keep the certificate that the "assets be preserved for

10. *Rubin v. Boatmen's Nat. Bank*, 811 S.W.2d 494, 496 (Mo.App.1991); *Carroll*, 498 S.W.2d at 607; *Bowers v. Jones*, 841 S.W.2d at 748.

11. 823 S.W.2d 105, 108 (Mo.App.1991). In *Sentinel*, the court determined that freezing a joint account, where there was a sole contributor, merely suspended any action on the account by the joint tenants and did not sever the tenancy.

12. 721 S.W.2d 40 (Mo.App.1986).

13. *Bowers*, 841 S.W.2d at 749 (Mo.App.1992). The *Bowers* court followed the reasoning in *Sentinel* with regard to freezing a jointly held account when there is a sole contributor.

14. In *LaGarce*, the joint tenants signed a separate agreement with the institution at the time the accounts were created. That agreement

provided any funds deposited into the account "shall be conclusively intended to be a gift at that time of such funds to the other signatory party or parties to the extent of his or their pro rata interest in the account." *LaGarce*, 487 S.W.2d at 495. While a request was made to have the certificate returned, no demand was made, and the joint tenants holding the certificate made arrangement to return it to the sole contributor. No other documents were executed in an attempt to secure sole control over the accounts or sever the tenancy, and the sole contributor died prior to the return of the certificate.

15. This Court need not address the issue as whether or not the revocation of authority was sufficient, in an of itself, in severing the joint tenancy because Robert's action of filing the partition suit satisfies the completed act standard of *LaGarce*.

his father." Unfortunately, R.J. died prior to the conclusion of his suit.

The general rule is that a pending suit for partition of a joint tenancy does not sever the right of survivorship of any of the tenants. "This rule is based on two related concepts: First, the theory of survivorship—that at the moment of death, ownership vests exclusively in the surviving joint tenant or tenants, and second, the doctrine that severance of the joint tenancy does not occur until the partition suit reaches final judgment." [16] It is axiomatic, however, that when a partition suit is filed by the sole contributor to a joint tenancy, who possesses the lifetime power to divest the interests of a non-contributing joint tenant,[17] the judgment in favor of severance is a forgone conclusion.

R.J. cites to *Estate of Munier v. Jacquemin*[18] and *Irondale Bank v. Crocker*[19] for the proposition that sole contributors to such accounts should be able to terminate a joint tenancy with a showing of sufficient facts probative of the intent to terminate it. To otherwise hold would result in undesirable situations where a joint tenant depositing all of the funds is thwarted in valid efforts to terminate the tenancy due to wrongful or fraudulent withholdings of such certificates.[20] There is no need, however, to engage in a discussion of R.J.'s obvious intent to extinguish the tenancy, because no further action was required to complete the act of severance prior to his death. On these facts, *LaGarce* does not require R.J.'s son to be rewarded for his wrongful refusal to relinquish the certificate.

### III.

Where there is a sole contributor to a jointly held certificate, absent proof of fraud, duress, or undue influence, a partition suit filed by the contributor when unable to regain physical possession to otherwise alter the certificate constitutes actual termination of the tenancy. To the extent the decision in *Bowers* is inconsistent with this opinion it should no longer be followed. This is in no way contrary to our holding in *LaGarce*, but merely serves to identify another method to satisfy the completed act standard. The judgment is affirmed.

PRICE, C.J., WOLFF and LAURA DENVIR STITH, JJ., concur.

HOLSTEIN, J., concurs in part and dissents in part in separate opinion filed.

LIMBAUGH and BENTON, JJ., concur in opinion of HOLSTEIN, J.

HOLSTEIN, J.

I respectfully dissent in part. I would hold that Robert J. Burkholder's attempt to terminate the joint tenancy in the certificate of deposit was not sufficient to support the trial court's finding that he actually terminated the joint tenancy and extinguished his son's right of survivorship.

### I.

In September of 1997, 92–year–old Robert J. Burkholder (R.J.) took steps to dis-

---

**16.** *Heintz v. Hudkins*, 824 S.W.2d 139, 142–43 (Mo.App.1992), citing to *Cobb v. Gilmer*, 365 F.2d 931, 933 (D.C.Cir.1966).

**17.** *Estate of Munier v. Jacquemin*, 899 S.W.2d 114, 117 (Mo.App.1995); *Auffert v. Auffert*, 829 S.W.2d 95, 98 (Mo.App.1992); *Blue Valley Federal Savings & Loan v. Burrus*, 637 S.W.2d 737, 745 (Mo.App.1982); and *Carroll v. Hahn*, 498 S.W.2d 602, 607 (Mo.App.1973).

**18.** 899 S.W.2d 114 (Mo.App.1995).

**19.** 913 S.W.2d 360 (Mo.App.1996).

**20.** *Id.* at 361.

inherit his son, Edward Burkholder (Edward). R.J.'s primary asset was an $85,000 certificate of deposit (CD). Until that time, Edward and his father were close, seeing each other at least once a week and traveling together. R.J. held most of his personal property jointly with his son. R.J. and Edward kept their respective personal papers in a shared safety deposit box. Edward balanced R.J.'s checking account every month and helped R.J. manage his assets, and had since 1987. Between 1987 and 1997, R.J.'s contact with his other four children was sporadic.

R.J. and Edward had a disagreement about the management of R.J.'s money in September of 1997. The dispute also involved Lois Cooper, R.J.'s friend and social companion. Until the day he died, R.J. and Ms. Cooper were in daily contact and had been for many years. R.J. had dinner at Ms. Cooper's house every night. Because R.J. did not drive a car due to failing eyesight, he relied on Ms. Cooper almost exclusively for transportation. Ms. Cooper helped R.J. write out his monthly bills. In the late summer of 1997, Ms. Cooper was made a signatory on R.J.'s checking account. Around this same time, R.J. and Ms. Cooper approached Edward and inquired about placing Ms. Cooper's name on the title to R.J.'s car. Shortly after, Edward noticed that the safety deposit box he used jointly with his father had been accessed by his father and Ms. Cooper on numerous occasions in the previous month.

On September 3, 1997, R.J. approached Edward, stating that he desperately needed money and wanted to cash the $85,000 CD at issue in this case. Edward was a joint tenant on the CD and advised his father against cashing it. At that time, R.J. had $4,000 in his checking account and, in Edward's judgment, was not in need of more cash. Edward feared that his father was suddenly depleting his assets at an alarming rate. R.J. became angry when Edward refused to help cash the CD. R.J. stated that if his own assets were ever exhausted, Ms. Cooper's family would take care of him. Edward then went to the bank and removed the CD from the joint deposit box to prevent R.J.'s access to it. R.J., with another son and Ms. Cooper, consulted with a lawyer when they discovered the CD missing from the deposit box.

R.J.'s attorney then contacted Edward and asked him to turn over the CD and remove himself as joint tenant on it and other assets. In a letter dated September 10, Edward informed the bank in writing that he had the CD and intended to keep it so that his father's "assets will be preserved and his income continue uninterrupted." On September 12, R.J. went to the bank, accompanied by Ms. Cooper, and asked to remove his son's name from the CD. The bank did not allow R.J. to make the change because Edward had physical possession of the CD. However, the bank permitted R.J. to execute a "revocation of authority to deal with fewer than all account owners." That document provided that the account would be frozen until the respective rights of the joint tenants were determined by court order or other agreement. The document also stated that the funds would continue to be held by the parties as joint tenants until that time:

The undersigned understands and agrees to the following consequences of this revocation:.... The funds contained in said account will continue to be owned jointly and will become the property of the survivor of the joint tenants ... [and][t]he undersigned [joint tenant] may not withdraw, cancel or nullify this revocation without the signature of all other joint owners of said account.

Soon after, R.J., again in the company of Ms. Cooper, executed a new will removing Edward and making Ms. Cooper a beneficiary. R.J. also added his other children who had previously been disinherited. On October 1, 1997, R.J.'s attorney filed an equitable action on R.J.'s behalf to terminate the joint tenancy. The petition stated that the CD is held in a joint tenancy, with R.J. as the sole contributor.

R.J. died on December 9, 1997. After R.J.'s death, the administrator of his estate was substituted as plaintiff. On March 26, 1998, Edward filed his answer in which he admitted that the CD was jointly owned. On May 26, Edward filed a petition contesting R.J.'s will. The two suits were consolidated, and the trial court heard evidence on November 23.

R.J.'s competence was not an issue in the suit to sever the joint tenancy. But R.J.'s competence to make a will was raised in the will contest. On that issue, the deposition of Dr. Bernard Bettasso, an internal medicine specialist, was read for the record at trial. Dr. Bettasso saw R.J. for a period of approximately 30 minutes on October 27, 1997. From his examination the doctor stated that he found that R.J. still had sufficient independent living skills to enable him to live outside a nursing home. The record does not indicate whether he was R.J.'s regular physician. During the examination, there was apparently no mention by R.J. or Ms. Cooper of the pending lawsuit or the change in the will. Accordingly, in his testimony, the doctor was only able to opine that R.J. was "probably" able to intelligently weigh and appreciate his natural obligations to his family—the doctor conceded that he did not "specifically get into" those issues with R.J. The doctor also conceded that he did not know whether R.J. might be easily influenced by others. Nevertheless, the trial court stated in its findings that it "greatly" relied on Dr. Bettasso's testimony in finding there was no evidence of undue influence and that R.J. was competent to make a will in September of 1997. The trial court entered judgment against Edward in the will contest.

As to the CD, the trial court did not find that the joint tenancy had been terminated during R.J.'s lifetime. Rather, it concluded that R.J. had an "absolute right to terminate" the joint tenancy. Based on that right, the trial court entered judgment in favor of the estate terminating the joint tenancy.

## II.

In contrast to the trial court's judgment terminating the joint tenancy, the majority reasons that termination of the joint tenancy had already been effected by the filing of the suit. The majority's rationale is based on R.J.'s clear intent to terminate the joint tenancy, as expressed when he filed suit. No doubt R.J. had taken steps to terminate Edward's right of survivorship in the asset. But R.J.'s efforts to sever the joint tenancy were incomplete when he died. I would hold that the effort R.J. made to terminate the joint tenancy did not change the legal relationship between the bank and its depositors or extinguish Edward's rights as surviving joint tenant.

Close attention to the relevant statute is essential. Section 362.470 provides in part:

When a deposit is made by any person in the name of the depositor in any one or more other persons ... as joint tenants or in form to be paid to any one or more of them, or the survivor or survivors of them ... the deposit thereupon and any additions thereto made by any of those persons upon the making thereof, shall become the property of these persons as joint tenants.... The mak-

ing of a deposit in such form, and the making of additions thereto, in the absence of fraud or undue influence, shall be *conclusive evidence* in any action or proceeding to which the bank or trust company or any survivor is a party of the intention of all the parties to the accounts to vest title to the account and the additions thereto and all interest thereon in the survivor. (Emphasis added.)

Ownership of joint accounts vests in the account survivor as a matter of law. *In re Estate of LaGarce*, 487 S.W.2d 493, 501 (Mo. banc 1972); *In re Gerling's Estate*, 303 S.W.2d 915, 917 (Mo.1957). Regardless of which joint tenant supplies the funds to a joint account, ownership of the account immediately vests in the surviving joint tenants upon the death of any joint tenant. *Bank of Washington v. Koester*, 939 S.W.2d 464, 467 (Mo.App.1996). The conclusive presumption of joint tenancy and ownership in the survivors is only rebutted by proof of fraud or undue influence. *In re Estate of Mapes*, 738 S.W.2d 853, 854 (Mo. banc 1987); *Estate of Hayward*, 884 S.W.2d 10, 14 (Mo.App.1994).

In reaching its result, the majority makes the assumption that R.J. would have, if alive, been *certain* to prosecute and win this suit to terminate the joint tenancy. As the principal opinion seems to concede, however, simply filing suit does not guarantee any particular result. The outcome is dependent on facts presented at trial. And at least one important additional fact—R.J.'s death—intervened between filing suit and trial in this case. If R.J. had lived, he would have been available as a witness and for independent medical examination to determine if his efforts to terminate the joint account were the product of incompetence or undue influence, conditions not uncommon among persons of his advanced age and failing health. The trial court would have had the

benefit of observing R.J.'s manner and mental condition directly, instead of relying on equivocal medical testimony by a physician who briefly examined R.J. for reasons unrelated to issues in the will contest. Had R.J. lived and additional evidence of his mental state been available, the certainty of judgment, on which the principal opinion relies, evaporates.

Also, it is conceivable that R.J., if alive and faced with the prospect of an actual trial, may have chosen to settle his differences with his son rather than pursue a judgment terminating the joint tenancy. There are numerous and obscure human variables that weigh on the outcome of any trial and on the willingness of a party to pursue a vindication of rights. The effect of the variables may be summarized in one simple truism: the act of filing suit never predestines the outcome of litigation.

In *Estate of LaGarce*, this Court found that "actual termination" is required to sever a joint tenancy and that mere "intent to terminate," even by one who was the sole contributor to the account, is insufficient. 487 S.W.2d at 501. The *LaGarce* case and the present case are factually quite similar. In both, the sole contributor took steps to remove the noncontributing joint tenant's name from the account in question. In both cases, the sole contributor died before the change could be legally effected. Both here and in *LaGarce*, the surviving joint tenant refused to surrender the CD at the demand of the decedent. It is true that the decedent in *LaGarce* made no written demand and did not file suit. But the decedent in *LaGarce* died just a few days after making the demand for return of the CD and had no opportunity to do so. Even so, whether or not there was a demand simply goes to intent and is irrelevant to whether a joint tenancy is actually terminated. *See Home Sav. Ass'n*

*of Kansas City v. Bratton,* 721 S.W.2d 40, 44 (Mo.App.1986).

It is puzzling that the majority perceives the need to distinguish *LaGarce* based, in that case, on the existence of a collateral agreement designating the joint account as a gift to the noncontributing joint tenant. The principal opinion's result turns on the filing of suit, not on the existence of a collateral agreement relating to a gift. Regardless, section 362.470.1 provides that when a deposit is made in the name of more than one person, as here, in form to be paid to any one of them, it "shall become the property of these persons as joint tenants." As in *LaGarce,* R.J.'s transfer of an ownership interest in the deposit to Edward without consideration is by definition a gift. *In re Patterson's Estate,* 348 S.W.2d 6, 10 (Mo.1961). This is the case regardless of any side agreements to the same effect between the joint tenants formally characterizing what is already by definition a gift. I find neither a need nor a reason to distinguish *LaGarce* on the basis of the collateral agreement. To distinguish *LaGarce* unnecessarily invites confusion and mischief.

As in *LaGarce,* after R.J. died his intent to terminate the joint account and his identity as the "sole contributor" became wholly irrelevant, in view of the conclusive presumption in favor of the surviving joint tenant. § *362.470.1.* And in this case, the only document executed by R.J., the revocation of authority, stated that the account would "continue to be owned jointly and will become the property of the survivor of the joint tenants." These instructions clearly indicate that R.J. intended the account to remain a statutory joint tenancy, until he reached an agreement with Edward or had an adjudication to the contrary.

Because R.J. never actually terminated the CD before his death, I would hold that the statutory presumption of title in joint tenancy remains intact. *LaGarce,* at 501; *Bowers v. Jones,* 841 S.W.2d 744, 749 (Mo. App.1992). Until now, this has been the firm resolve of this Court. *See Maudlin v. Lang,* 867 S.W.2d 514, 519 (Mo. banc 1993); *McGee v. St. Francois County Sav. & Loan Ass'n,* 559 S.W.2d 184, 187 (Mo. banc 1977).

### III.

If the legislature has spoken clearly and constitutionally on a subject, judicial determinations of what constitutes good policy must give way to that of the legislature. *Messer v. King,* 698 S.W.2d 324, 325 (Mo. banc 1985). When the General Assembly enacted section 362.470, its clear intent, except in limited circumstances, was to eliminate post-mortem litigation to determine the equitable owner of joint accounts. The legislature conclusively resolved the question of ownership in favor of the surviving joint tenants, absent fraud or undue influence. For more than twenty years, this Court has consistently followed the plain meaning of the legislative enactment.

To its credit, the majority holds that if the sole contributor's decision to file suit was the product of incompetence or undue influence, or other factors negating intent, those defenses should be available to the surviving joint tenant in that lawsuit. Since Edward could not have been aware of the new theory when he filed his answer or the need to assert and prove defenses to it, fundamental fairness suggests that the case should be remanded so the issues may be fairly asserted and litigated.

In any event, there is no reason to depart from this Court's precedent or create a new exception to a sensible rule: "An intent to terminate the joint tenancy agreement cannot be equated with actual termination." *LaGarce,* 487 S.W.2d at 501. I would reverse the trial court and

remand, holding there was no termination of the joint tenancy account.